## THE PEOPLE OF THE STATE OF NEW YORK *vs.* THE CENTRAL RAILROAD OF NEW JERSEY.

When a foreign corporation, by its officers, comes within this state, it becomes subject to the laws of the state, and to the process of the courts ; and where such a corporation, by its officers, is guilty of a wrong, or commits a trespass, within the state, the corporation cannot escape the consequences of its illegal acts, by setting up that it holds its existence under a foreign government.

Where a complaint in behalf of the people of this state against a foreign corporation, shows a claim of title to, and jurisdiction over, certain waters, by

The People *v.* Central Railroad of New Jersey.

the plaintiffs; that the defendants have taken possession, and are by their officers still in possession, and without authority, this is sufficient to give jurisdiction, if the process can be served on the defendant. If there is an improper service, that must be remedied by motion.

The grant to the state of New York, by the third article of the compact or treaty between that state and the state of New Jersey, made in 1833, of exclusive jurisdiction over all the waters of the bay of New York, and all the waters of the Hudson river, and of and over the lands covered by said waters, to low water mark on the New Jersey shore, subject to the right of property therein granted to New Jersey, conferred upon the state of New York full power and authority to preserve the river and bay from injury by encroachments from strangers acting without authority.

The jurisdiction given to the state of New York, by that article, is not the mere right to serve process either civil or criminal, but is the jurisdiction granted by one sovereign power to another; and in that sense it means the right of exercising authority—of governing and controlling.

The exclusive jurisdiction in the state of New York, over the waters of the Hudson river, and over the land under the water, gives a right of property therein, sufficient to maintain an action for an encroachment thereon, by erecting docks and piers connected with the main land; notwithstanding the fee of a portion of the land is vested in the state of New Jersey.

Where, in an action brought by the people of the state of New York against a foreign railroad corporation, it appeared from the pleadings that the defendants had taken possession of a tract of land under water, in the bay of New York, and the Hudson river, displaced the water by filling in the same to the extent of eight hundred acres, in a portion of the bay and river over which the state of New York has exclusive jurisdiction, and were engaged in filling in to a larger extent, and would cause serious damage to the harbor of New York; and that they were so doing without any right, and without any grant or permission from the plaintiffs; and by their admissions the defendants appeared as simple wrongdoers and trespassers, committing a serious injury to the rights of property of the plaintiffs; *Held* that it was a proper case for restraining them, by injunction, from doing further wrong and damage, until it should appear that they had some right and authority for their proceedings.

The boundaries of the state of New York extend to low water mark on the New Jersey shore; and the county of New York, on its western boundary, extends to the west bounds of the state.

THIS action is brought by the people of the state of New York, against the defendants, to prevent encroachments in the Hudson river, on the westerly side, adjoining the shore of New Jersey.

The complaint avers that the defendants are a body corpo-

rate under the laws of New Jersey. It then sets out the agreement or treaty entered into between New York and New Jersey, as to the rights of each to the land and water in the Hudson river, south of Spuyten Duyvel creek, and avers that the defendants, without any permit or authority from the plaintiffs, and without any right, have for five years last past, and upward, been infringing, encroaching upon and violating the jurisdictional rights of the plaintiffs, and obstructing the navigation of the waters of the Hudson river and the bay, by taking possession of and appropriating to its own exclusive use about eight hundred acres of the land and water lying west of the middle of the waters of the bay of New York and Hudson river, over which the plaintiffs have exclusive jurisdiction. That the defendants have displaced the waters over the land by erecting docks and piers, and filling in the same, and have connected the same with the main land of New Jersey by a wooden trestle work about one mile in length. It further alleges that this part of the Hudson river and the bay are arms of the sea, in which the tide ebbs and flows ; that previous to the filling, the natural depth of the waters was from one to twenty-four feet, and was actually navigable by vessels of the largest size, and would be so in many parts of such filling. It charges that the filling is made with materials affecting injuriously the sanitary condition of the inhabitants, and that such structures form a common and public nuisance by narrowing the channel of the river and bay, and obstruct the use of the waters, and as such nuisance they ask ask an injunction against its continuance and extension.

To this complaint, the defendants demurred, upon the grounds :

1st. That it appears from the complaint, that the court has no jurisdiction of the defendants.

2d. That the court has no jurisdiction of the subject of the action.

3d. That the complaint does not state facts sufficient to constitute a cause of action.

The case was heard at special term, before Justice POTTER, who gave judgment for the defendants, and the plaintiffs appealed to this court.

*J. H. Martindale,* (attorney general,) for the appellants. I. The defendant is a corporation, organized under the laws of New Jersey. 1. As such corporation it has entered the bay of New York and Hudson river, opposite the southerly extremity of the wharves of Jersey City; has driven piles and constructed thereon a tressle work, intruding into the bay about one mile; has laid a railroad track on such tressle work; has driven piles around an area of about 800 acres at the termination of such tressle work; has filled in portions of that area with the debris of Jersey City and New York, and elevated the made ground above the waters of the bay, and throughout that space has infected the air, impeded navigation and destroyed the fisheries. 2. All these acts have been done without the consent or authority of the people of this state. 3. Assuming that these acts have been committed in a harbor of this state, which is an arm of the sea, where the tide ebbs and flows, they present a plain case of nuisance, *purpresture,* on public rights and property. As such, they may be enjoined by the courts of equity. (*Lansing* v. *Smith,* 8 *Cowen,* 116. *Angell on Tide Waters,* 64. 2 *Story's Eq. Juris.* § 921. *Att'y Gen'l* v. *Cohoes Co.,* 6 *Paige,* 133.)

II. The case does not involve the point of *repugnancy* to the constitution of the United States, because it cannot be claimed that the United States has assumed any jurisdiction over the place in question, contravening the right of the state to interfere, and preserve the rights of the people against interruption. (*Wilson, &c.* v. *Blackbird Creek Marsh Co.,* 2 *Peters,* 245.) This was an action of trespass *vi et armis,* for injury to a dam constructed across a creek, entering the Delaware where the tide ebbed and flowed. The erection of the dam was authorized by an act of the legislature of the state of Delaware.

The act was questioned as being repugnant to the constitution of the United States. Held not repugnant.

III. The place in question is conceded to be situated on land, the property right of which is in the state of New Jersey. 1. Although the property right in the land is vested in New Jersey, it cannot be claimed that there is attached thereto a right to exclude citizens of the United States, and of the state of New York in particular, from the enjoyment of all the easements and navigation rights which pertain to the bays and public waters of the United States. (*Mississippi R. R. Co.* v. *Ward,* 2 *Black, U. S.* 485.) The public right in this respect is not abated by the *several* ownership of the land under the water. The question of territorial boundary will affect the remedy in the courts, but not the intrinsic character of the right. (*Id.*) 2. In the present case, the impediment to jurisdiction, which arose in Ward's case, is obviated and removed by the very means suggested in the opinion of the court as adequate for that purpose.

IV. It thus appears that a public nuisance exists by the act of the defendants, cognizable and *removable* by a state court of equity.

And the remaining question is whether the allegation that the act has been done without the consent and authority of the people of this state is sufficient to give jurisdiction, and to complete the statement of a cause of action.

Suppose the consent of New Jersey as the proprietor of the land under water, *without* the consent of New York, is sufficient to authorize the defendants' structures, would the complaint be sufficient ? It might be answered, that the act, being in its nature a *purpresture* on public rights, and within the jurisdiction of New York, it is necessary to plead the license or authority derived from New Jersey. But it will be more satisfactory to show, that New Jersey cannot give such consent, by reason of her proprietary right in the soil. 1. The right of New Jersey is a mere right of property. Jurisdiction which, when applied to states, describes the attribute of sove-

reignty, is expressly separated from her right of property, and vested exclusively in New York. 2. In our complex system of state governments, subordinated to a common and general government, the instances are and must be frequent, where the rights of property held by one state are dissevered from jurisdiction or sovereignty, which are recognized and vested in another state. (*Compact between New York and Massachusetts, cited in Fellows* v. *Denniston*, 23 *N. Y. Rep.* 424.) 3. This is true of the government of the United States, when the case arises in which, within the limits of a state, the United States acquire a right of property for some public use, not requiring the exercise of governmental jurisdiction.

. " The purchase of lands by the United States for purposes within the territorial limits of a state, does not of itself oust the jurisdiction or sovereignty of such state over the lands so purchased." (*U. S.* v. *Cornell*, 2 *Mason*, 60.) This will be especially the case where, in the western territories, new states are formed and put in operation long before the public lands have been sold and become vested in the ownership of private parties. 4. Exclusive jurisdiction, being the attribute and definition of sovereignty in a state, includes all power and rights, other than the mere right of property, held subject to such jurisdiction, whether held by a state or a citizen. 5. *Pro hac vice*, the right of property in New Jersey to the land in question, is qualified and restrained by the sovereign jurisdictional rights of New York. All that New York has parted with, all that New Jersey has assumed to acquire, is a property right *dissevered* from all authority as a sovereign—all jurisdiction as a state—in other words, all power to make laws, or legislate for, or govern or exercise authority over, the place in question, except the regulation of the fisheries, but such regulations must be so made as not to obstruct or hinder navigation. 6. In this particular case, the acts of the defendants tend to impair the territorial rights and boundaries of New York. If this process of filling up the bay of New York may be continued on the westerly side of the centre of the

Hudson river, the present boundary line, defined by the low water mark on the western shore, will be oblitered. In effect, the territorial boundaries of New York are defined by the low water mark on that shore, along the Hudson river and upper bay of New York. This is not changed by the compact of 1834. The boundary line in the center of the river and bay is expressly modified by " *exceptions.*". The language is explicit ; " The boundary line between the two states," &c. " shall be the middle of the river — of the bay of New York," &c. " *except as hereinafter otherwise particularly mentioned.*" The only exception thereinafter particularly mentioned, affecting this part of the line, is found in the reservation of the jurisdictional rights of New York, which are extended to low water mark on the Jersey shore. The territorial boundary between states defines the common dividing limits of their respective jurisdictions. Burrill's Law Dictionary, title Jurisdiction : The jurisdiction of a state is defined to be " the power to make laws — power to legislate or govern — power or right to exercise authority." Again, in Wildman's International Law, p. 40, " the rights of sovereignty extend to all persons and things not privileged within the territory." *Id.* 60 : " The independence of states is inconsistent with the claim of any foreign potentate to exercise any jurisdiction or authority within their territories without their consent. The authority of a state within its own territories is absolute and exclusive. It is susceptible of no limitation not imposed by itself. Any restriction upon it deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in the power which could impose such restriction." " It is not easy to conceive a power to execute municipal law, or to enforce obedience without the circle in which that law operates. A power to seize for the infraction of the law is derived from the sovereign, and must be exercised within the limits which prescribe the sovereign's power." (*See Rose* v. *Himely,* 4 *Cranch,* 278.) " Bynkershoek, ac-

cordingly, confines the jurisdiction of a state to persons and things within its territory, or to its subjects in a foreign country, so far as the sovereign allows it to operate."

V. The defendants do not attempt to confute the above propositions directly, because it is conceded if the works of the defendant, which the plaintiffs complain of, are within the exclusive jurisdiction of New York, then the complaint against them *may* be sustained. 1. But it is said that the structures complained of as nuisances, although constructed in the bay of New York, are taken out of the jurisdiction of New York by *the act of construction* because (it is said) the right to make such structures is reserved in the compact of 1834, and when the wharves are constructed, they are transferred, by the terms of the compact, to the jurisdiction of New Jersey. 2. This proposition, the plaintiffs deny. The 3d article authorizes improvements, wharves, &c. to be made *"on the shore,"* and not elsewhere. Suppose it is conceded (which it is not) that the building of wharves "on the shore," will require an extension of the wharves beyond low water mark, in order to reach water of sufficient depth to float vessels of such tonnage as would be expected to navigate the bay of New York. That construction, cannot by any fair intendment, authorize the building of wharves, *far out into the bay*, entirely dissevered from the *shore*, and only accessible by a bridge of " tressle work," one mile in length. 3. With such concession, at *most*, this article could only be construed to permit the construction of wharves " on the shore of New Jersey," just as that shore existed at the time of the compact. It cannot, by any fair intendment, be construed to authorize the building of " artificial shores" far extending into the bay, and the obliteration of the bay, by filling it with earth, to the extent of human power, and planting thereon a city. 4. These acts are encroachments on the rights and jurisdiction of New York, and ought to be prohibited. If this be true, there can be no doubt of the jurisdictional authority of the Supreme Court of New York.

Whether that court, or the United States Court, shall be applied to, must be confided to the discretion of the attorney general of the state. 5. The above argument disposes of the technical objection, that it does not appear that this court has jurisdiction of the person of the defendant. If the complaint shows that the structure complained of was within the jurisdiction of New Jersey, brought within that state by the very act of making the structure, it would be needless to raise the preliminary objection, of want of jurisdiction of the defendant's person, and it is a sufficient answer to the objection, to say that the same argument which disproves that New Jersey has a right, under the compact, to build wharves far out into the bay, a mile distant from the "shore," disposes of the technical objections, raised to the jurisdiction of the court, because it proves that the property and structures of the defendant are actually within New York.

VI. But it is argued that civil jurisdiction cannot be extended beyond the territorial limits of the state; and that the territorial limits of New York are confined to the middle of the river and bay, *except* in respect to the islands named in the 2d article of the treaty or compact of 1833. We answer, on behalf of the state of New York, that this argument of the defendants contains in the "exception" which it allows, (and which it is plain could not be avoided) an admission fatal to the whole argument. 1. What is the exception in the 2d article, which places the "*islands*" referred to within the territorial limits of New York? They are declared to be within the "*exclusive jurisdiction*" of New York. If "exclusive jurisdiction" *ex vi termini* brings the *islands* within the *territorial* limits of New York, what ingenuity of argument can prevent the same "exclusive jurisdiction" from bringing the upper bay of New York within the same territorial limits? It is abundantly proved that the right of property in the land does not confer *jurisdiction*, or in other words, *sovereignty*. 2. But the whole

The People *v.* Central Railroad of New Jersey.

argument confronts the plainest terms of the compact, viz. *"exclusive jurisdiction,"* clearly, unmistakably contained in New York. The language of the 6th and 7th articles shows that it was supposed, when property was taken, or persons escaped into the "exclusive jurisdiction" of New York, they were *"out of the state"* of New Jersey.

VII. It was conceded in the court below that the police jurisdiction ceded to New York by the compact, included subjects of "quarantine and *commerce.*" 1. This concession is fatal to the defense. The commercial necessities of New York demanded that she should give law exclusively to the upper bay. The act complained of is destructive to the bay in a material degree. How can it be shown that the rights of New York, included in these commercial interests, connected with the use and government of the bay, are not invaded, when a portion of the bay, a mile in extent, navigable for vessels of 300 tons burthen, is inclosed with piles and debarred from commercial use and control, and jurisdiction by New York?

SUPPLEMENTAL POINTS. Since the preparation of the foregoing points, the argument or opinion of Justice Potter has been furnished by respondent's counsel. This opinion was not prepared when the appeal in this case was made and the appeal papers were printed.

Four propositions are stated by Justice Potter as the law of this case, viz:

1. The courts of this state have no jurisdiction of the question and subject matter of this action, because in effect the disputed question is one of boundary between two sovereign states, and there is no authority to make the state of New Jersey a party to the action.

2. The territorial limits of New Jersey extend to the middle of the Hudson river and the bay of New York, and embrace the *locus in quo;* and the courts of this state have no

jurisdiction to adjudicate and enforce its judgments within the territory of another sovereign state.

3. *Non constat,* the *locus in quo* is between high and low water mark on the New Jersey shore, although it is alleged in the complaint, and therefore admitted by the demurrer, that the whole area is included within the territory, over which exclusive jurisdiction is given to the plaintiffs by the third article of the agreement between New York and New Jersey ; that it was part of the Hudson river, and actually navigable in most parts thereof by vessels of the largest size, and would be navigable for vessels of three hundred tons burden and under, were it not for the structures of the defendants.

4. The term "*shore,*" as expressed in the said agreement, means *wharf line,* or as far out into the river and bay as New Jersey may find it practicable and may choose to extend wharves.

I. The first proposition is not founded in fact. This suit is not brought to settle the boundary line between the states of New York and New Jersey. That was settled by the compact of 1834. Can it be plausibly claimed that the courts of New York, within her own territory as defined by that compact, cannot abate public nuisances, nor enforce the laws of New York against private persons ? The object of the suit is expressed in the prayer for relief, viz. to abate a public nuisance. Will the mere allegation by the defendant, that the *locus in quo* is without the territory of the state, deprive its courts of all authority to consider the question of territory and to abate the alleged nuisances if the allegation should prove untrue ? (*N. Jersey* v. *N. York,* 5 *Peters,* 283.)

II. The second proposition of the learned justice, it is respectfully submitted, contains the error which pervades his whole opinion. He confounds the boundary line which divides the *property* rights of the two states in the *land* under water with their respective *territorial* limits. 1. The boundaries of the state are defined in the 1st section, 1st title, 1st chapter, and part 1st of the Revised Statutes. Its jurisdiction is de-

clared in the second title. These boundaries must be recognized by our own courts at least, whatever may be the action of the courts of New Jersey. In this part the boundaries, both of property and jurisdiction, are defined as follows : From " a rock on the west side of Hudson's river, in the latitude of 41 degrees north, marked by said commissioners ; then southerly along the west shore, at low water mark of the Hudson's river, of the Kill Van Kull, of the Sound between Staten Island and New Jersey, and of Raritan Bay to Sandy Hook." 2. The first article of the compact of 1834 defines the middle of the said river, kill, sound and bays as the boundary line, " *except as thereinafter otherwise particularly mentioned.*" The words " boundary line " do not recur in the whole compact, and if the important qualifications contained in the succeeding articles do not affect the boundary line, as it relates to territorial or jurisdictional limits, then the exception contained in the first article is wholly without meaning. In *Rose* v. *Himely*, (4 *Cranch*, 278,) above cited, Chief Justice Marshall says : " The legislation of every country is territorial. It is not easy to conceive of a power to execute a municipal law without the circle in which that law operates." " The pacific rights of sovereignty must be exercised within the territory of the sovereign." It follows that every clause in the articles of the compact of 1834, succeeding the first, do relate to and affect the boundary line between the states, so far as that term defines a territorial line. The boundaries of territory and " exclusive jurisdiction " must be the same. Territory signifies " the compass of land within the jurisdiction of a state." (*Bouvier's Law Dictionary. Worcester's do.*) Suppose the islands retained by New York, in the second article, shall be built upon and inhabited, can it be admitted by our own courts that the residents will belong to New Jersey and not to New York ? Will they be removed beyond the territory and county of New York ? The 5th subdivision of section 2, title 1, chapter 2, part 1 of the Revised Statutes defines the boundaries of the county of

New York, and extends the south boundary "across the North river, so as to include Nutten Island, Bedlow's Island, Bucking Island, and the Oyster Islands, to the west bounds of the state." (*Senate Journal of* 1808, *pp.* 52 *to* 92. *Id. of* 1828, *appendix A.* §§ 12, 13, 17, *title* 10, *ch.* 20, *part* 1, *R. S. Id.* §§ 78, 79, *art.* 4, *title* 5, *ch.* 9, *part* 1. *Id.* § 11, *title* 6, *ch.* 1, *part* 4.) But the opinion of Justice Potter places nearly all these islands within the territorial limits of New Jersey.

It is to be recalled, that at the time of the compact New York did extend her jurisdiction in fact as well as boundary line to low water mark on the west shore of the Hudson river—and New Jersey obtained nothing within those limits except what was yielded by the compact. She did obtain four rights. 1. Jurisdiction over wharves made on the shore, and vessels either aground on the shore, or fastened to wharves ; except the jurisdiction incident to quarantine and health laws. In other words, vessels either attached to a wharf or grounded on the shore where no wharf was built, were transferred to the jurisdiction of New Jersey. 2. She obtained the exclusive right of property in the land under water west of the middle of the river and bay. 3. She obtained the exclusive right to regulate the fisheries in these waters. 4. She obtained a right to serve process in certain cases, both criminal and civil, within that territory, but this right was qualified with an *express admission,* that the process when executed against property, was so executed *out of the state.* (*Arts.* 6 *and* 7 *of Compact of* 1834.) Every one of these rights is consistent with the jurisdiction and sovereignty of New York over the whole territory. Even the jurisdiction given to New Jersey over the vessels grounded on the shore or attached to wharves, was a floating temporary jurisdiction, and did not diminish the exclusive jurisdiction of New York over the territory. Process for assaults, of replevin, and the like, executed and arising within the territory, and not on a vessel actually attached to the shore,

must still be issued out of the courts of New York, to the same extent as before the compact. In short, the learned justice has committed the grave error of construing a compact or treaty, which is full of the most explicit provisions, to secure the territorial authority of the state of New York over the *locus in quo*, into a surrender and transfer of that authority to New Jersey.

III. The third proposition of the learned justice, viz. that the complaint is defective because the fact is not alleged, that the *locus in quo* is below low water mark, is not technically correct. Even if the objection had been specially stated in the defense, and was well founded, the plaintiffs should have had liberty to amend the complaint. But the complaint is not defective. It alleges as matter of fact, and not of law, that the *locus in quo* is within the area over which by the third article exclusive jurisdiction is given to the plaintiffs, that is, the area of land in the bay of New York and Hudson river, covered by the waters from Manhattan Island " to the low water mark on the westerly or New Jersey side thereof." The learned justice treats this part of the complaint as a claim of "jurisdiction by virtue of the treaty and statute." It is certainly an apt description of the fact, that the place is bounded on the west by the low water mark on the Jersey shore.

IV. But the fourth proposition, if sustained, will be a full and complete justification of the grievances alleged in the complaint. So far as New York is concerned, she will have no right to complain, if New Jersey has physical power, and exerts it to fill up and obliterate the west half of the Hudson river and bay below the forty-first degree of north latitude. The learned justice has decided that the word " *shore* " employed in the treaty, cannot be construed by "literary lexicons" or "according to legal and maritime definitions." The enlarged definition suggested and adopted by the learned justice is, " a place where wharves and docks may be built, and to which vessels may be fastened." 1. It must be con-

ceded that this definition effectually disposes of all the complaints of New York presented in this case.  We complain that a bridge has been extended for the distance of a mile into the bay, and that an area of 800 acres is embraced within these structures, but this definition disposes of the complaint, and expressly confers the right to make the structures, and to exercise exclusive jurisdiction over the whole area embraced by them when made.  The plaintiffs insist that the court is not at liberty to substitute this extraordinary and perverted definition of a familiar word for the true one. (*Story on Contracts,* § 639.  *Westcott* v. *Thompson,* 18 *N. Y. Rep.* 363.)  2. If the courts are at liberty to alter and enlarge the plain phraseology of a compact, to subserve the convenience of one party, at the expense of another, then the rules of construction will be involved in irremediable uncertainty and fluctuation.  3. The intention of the compact can be sought in the previous relations and disputes of the parties.  New York then claimed and held the property as well as the territorial right in the soil to low water mark on the west or Jersey shore.  The landings on that shore, where there were no wharves, were necessarily on the ground ; and therefore, before the compact, every vessel aground on the shore, or attached to a wharf, if it extended into the water, afforded a safe refuge from the authority and jurisdiction of New Jersey.  This inconvenience was removed by the compact, which recognized equal jurisdiction in New Jersey, over her wharves and shores, and the vessels attached to or aground thereon.  4. But it is a fact that the attention of New Jersey, thirty years ago, was not directed to Jersey city, but to Perth Amboy and Newark for commercial ports.  These places, and not Jersey city, were made ports of entry, and they were especially provided for in the compact of 1834, by provisions extending the exclusive jurisdiction of New Jersey to Staten Island in the lower bay, exactly like the provisions which preserved the ancient and necessary dominion of New York over the Hudson river and bay of New York.

(*Laws U. S. of* 1834, § 9, *ch.* 135. *Senate Journal of* 1808, *p.* 71.)

*L. B. Woodruff,* for the respondents. I. It appears, by the complaint, that this court has no jurisdiction of the defendants. 1. By the express provisions of the statute this is good cause of demurrer. (*Code,* § 144.) It is, therefore, not necessary to plead it (or set it up by answer) in abatement. The demurrer for this cause being now authorized by statute, it does not operate as a *waiver* of the objection, as a general appearance might have done in our former practice. To hold that the defendants, by demurring — setting up the objection — submit to the jurisdiction, is to make this statute a nullity in the face of its express provision, that when this appears upon the face of the complaint the defendants may demur. 2. The complaint states that the defendants are a foreign corporation. This court has no jurisdiction of such a corporation, unless certain facts exist which, by statute, create an exception to the general rule. This results from the general principle that (without express statute making certain facts operate to enable a suit to be brought,) there is no mode of compelling a foreign corporation to appear in our courts. *In re McQueen* v. *Middletown Manufacturing Co.* (16 *John.* 5,) it was held that a foreign corporation *could not be sued* in this state ; and, therefore, that its property could not be attached. The Court of Chancery held that that court had no jurisdiction to attach the property of a foreign corporation : and this decision was affirmed, on appeal. (*Reviser's notes to* §§ 17, 30, *of Art.* 1, *Tit.* 4, *Chap.* 8, *Part* 3 *of R. S.*) This led to the statute authorizing attachment as a mode of acquiring jurisdiction, under which, if the corporation chose to appear, "jurisdiction of the person" was acquired, otherwise the proceeding, under the statute, was *in rem* only. 3. The complaint showing that the defendants are a foreign corporation, it shows that this court has no jurisdiction of the defendants, unless it has been gained

under some statute and by the fulfillment of the *conditions* requisite. *Prima facie,* there is no such jurisdiction. The complaint should show some facts which take the case out of the affirmative rule, and which satisfies the conditions upon which an exception arises. In *Bates* v. *New Orleans I. & G. N. Railway Co.* (4 *Abb.* 72,) the Supreme Court, in general term, held, that under the Code it was *essential* to the *acquisition* of *jurisdiction,* that the foreign corporation owned *property within this state.* · When, therefore, it appears by the complaint that the defendant is a foreign corporation, *prima facie not liable* to be sued in our courts, the *essential requisite* to give jurisdiction must be averred. 4. There is no averment of *any facts* which take the case out of the general rule. It is not averred that the defendants have any property within this state. The amendments of the Code (sec. 134 after the decision above cited,) authorizing the commencement of a suit against a foreign corporation where service of the summons " shall be made within this state, personally upon the president, treasurer or secretary thereof," has only created another exception to the general rule. The essential requisites or conditions must still appear to be satisfied, else the *prima facie* want of jurisdiction appears and must prevail. A suit may be commenced by the *service* of a summons. *(Code,* § 127.) But by § 134 no such service can be made upon a foreign corporation, and, therefore, no action can be commenced, *unless* the conditions before referred to are satisfied. Of this there is no averment. 5. To any suggestion that it is not usual in practice to state, in the complaint, the mode or process by which the action was commenced ; and hence an averment that the defendants *have property in the state,* or that the summons was served upon the president, &c., is not necessary ; it is answered. The practice was formerly, even in actions against individuals, to declare against the defendant as " in custody, &c." which imported service of a *capias ;* or, as having been " duly summoned," which imported service of a summons ; or where the defendant was

sued by service of a declaration with notice to plead, it was usual to refer to the statute, in the declaration, as the ground of declaring against a defendant yet to be served. An omission to make any such statement would be of no importance when it was not ground of demurrer ; for, before the Code such a demurrer would, of itself, be a submission to the jurisdiction, and waive the defect. When the complaint does not, on its face, show *prima facie* want of jurisdiction, this court having general jurisdiction of persons and corporations within the state, jurisdiction may be presumed without formal averment of the service of the summons. The present practice, in actions against persons and domestic corporations, may, perhaps, be sustained on such presumption. Be this as it may, no such presumption can arise where it *does appear prima facie* that no such jurisdiction exists.

II. The practical question then is : Has the state of New Jersey the right to make wharves, docks and other improvements along the westerly side of the Hudson river and bay of New York, below Spuyten Duyvel creek ; or has that state by voluntary treaty with New York surrendered that right ? The bill does not proceed upon the idea that prior to the treaty New Jersey had not this right to the full extent that sovereignty confers it on any state or kingdom bounded by navigable waters. The ground of the complaint is that by voluntary treaty the right has been surrendered. Such consequences, the improbability of any such intention—the obvious breach of fidelity to her own citizens—the fact that it involves a like surrender by New York of the same right along a portion of her territory, and that if it be held that New Jersey cannot build such wharves from her shore, or New York cannot from hers, then such wharves cannot be built at all, since neither can build wharves within the territory of the other ; all these considerations forbid such a construction of the treaty, unless its terms are such and so clear as to imperatively require it.

The treaty embraces the right of the respective states in

the whole extent of the waters and shores, from the northern boundary of New Jersey, to and including Raritan bay. So that whatever right or authority was conferred upon New York, in respect to the waters of Hudson river and the bay of New York, was in like manner, and to the same extent conferred upon New Jersey in respect to the waters of the Sound, between Staten Island and New Jersey, below Wood-bridge creek and the waters of Raritan bay. (Article first of the treaty.)

Establishing the boundary between the two states, *ex vi termini*, establishes the *proprietorship* of the states respectively to the *middle* of the Hudson river, bay of New York, the Sound and Raritan bay. On either side of the middle or dividing line, the two states are respectively *owners ;* New York on the easterly, and New Jersey on the westerly side thereof. (*Angell on Tide Waters, p.* 86, *&c. ch.* 4, *p.* 123, *n.*) The right to construct wharves, piers and other improvements, follows as an inherent result.

Within its boundary the property of the state is exclusive and unqualified—as well in lands under water in the sea, and navigable rivers, as in upland. (2 *Black. Com.* 262.)

It is a maxim of international jurisprudence, that within its territorial limits, the authority of a state is supreme and exclusive of every other state. And all property, real and personal, as well as persons, within those territorial limits, are wholly subordinate to the laws, authority and control of such state. A state has exclusive authority to determine and regulate the manner of holding and using such property ; and the validity of all acts done within its boundaries. Another rule is alike primary and fundamental ; each state has the exclusive right to determine and administer the remedies and modes of redress for any use or appropriation of real estate within such boundaries, which is not warranted by its own laws ; and to sustain and uphold such use where its own laws give their sanction. These rules deny to the state of New York any right or interference in any form with the

lands or waters west of the boundary line ; for no state can by its own laws affect or bind real estate out of its own territory.

An act which is lawful within the limits of the state where it is committed is to be regarded as lawful everywhere, whether it affect person or property, real or personal, within those limits. By force therefore of the first article of the treaty the state of New Jersey has the right to any and every use of the waters and lands under water which is involved in exclusive proprietorship. This includes the right to build docks, wharves, piers, &c. and the right to redeem lands from the water. This proprietorship is the warrant for each state to construct wharves, &c. on their respective sides of the river above Spuyten Duyvel creek. And yet the right rests on the first article, and these rules which result therefrom, and on them only.

The third article of the treaty is not only not in conflict with the first, nor with the view thus presented of its legal effect and operation, but it affirms · and establishes the propositions deduced therefrom. (*See Article 3d.*) The jurisdiction of New York is made expressly subject to the rights of property, and to the jurisdiction of New York, viz : 1. The state of New Jersey shall have the exclusive right of property in, and to the land under the water lying west of the boundary line. 2. The state of New Jersey shall have the exclusive jurisdiction of and over the wharves, docks and other improvements made, and to be made on the shore of the said state, and of and over vessels, &c. &c. fastened to such wharf or dock. This is a clear and unequivocal declaration in express terms of the exclusive rights which as above insisted are implied in the establishment of the boundary by the first article. It was here inserted, to avoid any uncertainty respecting the operation of the grant of jurisdiction to New York, and to make that grant wholly subject and subordinate. Exclusive jurisdiction over wharves, docks

and other improvements to be made, imports the right to make, and jurisdiction to regulate and control the mode and manner of making. The parties did not intend to make, and did not make the property of New Jersey, nor her exclusive jurisdiction of, and over wharves, docks and improvements to be made, subject to the jurisdisdiction of New York, but to make the jurisdiction of New York subject to them. The questions how the lands under water shall be enjoyed or used, when and in what manner wharves and other improvements shall be made, New Jersey may determine for herself, and to her determination the jurisdiction of New York is subject and subordinate. And her jurisdiction over wharves, &c. to be made imports such power, and assumes that they will be made, under the control and discretion which such jurisdiction implies.

The right of jurisdiction conceded to the state of New York to low water mark is not inconsistent with the right of New Jersey to build such docks, wharves and other improvements, or to redeem lands from the water. It can have full operation and effect for all the purposes of the agreement. The object was in this respect, to give to New York jurisdiction over waters, and not over land then made, or thereafter to be made, whether the changes were produced by natural causes or artificial means. The argument of the complaint would make low water mark a fixed line precisely where it was found at the date of the treaty. Can it be gravely argued, that it was intended to give New York jurisdiction over lands, or erections thereon, stores, dwellings, or other improvements, which (by whatever authority) should by any means be added to her shores ? Low water mark is a fluctuating line, and jurisdiction limited by that line, advances or recedes with such fluctuation. Besides, the jurisdiction given to New York, "of and over the waters and lands under the waters" is fully satisfied by the evident intention to give such jurisdiction over the waters, and over the lands while under the water. This must necessarily be so, when

The People *v.* Central Railroad of New Jersey.

New Jersey has exclusive property therein, and having such property, the treaty gives her jurisdiction over wharves, &c. *to be made.* Giving to her property in the lands under the water, gave her property *usque ad cœlum.* There is therefore nothing incongruous, or inconsistent with the jurisdiction given to New York, in the right of New Jersey to build wharves, or reclaim lands from the water. Any other construction asserts that neither state has the right to construct a wharf for any useful purpose, nor reclaim any land below low water mark at any place on the west side of the Hudson river and bay of New York, or on the west side of Staten Island, below Woodbridge creek, and on that island along Raritan bay, however important to either it may be, and whatever the lapse of time, or exigences of trade or commerce may require. Such construction is not to be tolerated, and it may safely be asserted that neither New York or New Jersey, would have ever consented to such a relinquishment of power, so important to each ; and it is not less clear that the congress of the United States would not have consented to such a restriction upon the claims and interests of trade and commerce.

The practical construction heretofore given to the treaty, in this respect, affirms this view of the rights of the state of New Jersey ; a view which has never before been questioned, but fully acquiesced in by the state of New York.

If the terms of the treaty were doubtful, thirty-three years of practical exposition of the rights of the parties have demonstrated the meaning of the treaty in question. Witness the wharves, &c. at Weehawken, Hoboken and Harsimus, and an immense area of lands there once covered with water, with the long wharf extending a mile or more from the upland, and now the location of the depot and warehouses of the Erie railway company, and the track of their railroad, &c. wharves, ferry slips, docks and bulkheads of Jersey City, with streets and warehouses thereon. If cotemporaneous usage and acquiescence in long continued exercise of rights claimed, can

avail to settle the meaning and effect of a treaty or compact, the claim of the defendants is now conclusively settled in conformity with the views now submitted on their behalf.

III. New Jersey having, therefore, the *exclusive* right of property in the land under water, and having *exclusive* jurisdiction over docks, wharves and other improvements *to be made*, the jurisdiction of the state of New York, and of the courts of New York, is necessarily excluded. Laying out of view for a moment the alleged effect upon navigation or upon health, the length or breadth of the alleged improvements is wholly immaterial. That, New Jersey has the right to determine for herself. So as to the mode and manner of making the same, New Jersey is not subject, *directly* nor *indirectly*, to the control of New York or its courts.

IV. The exclusive right of property being in New Jersey and the jurisdiction of that state *of* as well as *over* wharves, docks and improvements *to be made* being exclusive, the case is narrowed to this inquiry. Can the courts of New York take cognizance of and will they entertain an action to *abate* an alleged nuisance on the shore of New Jersey—it being on the property of that state, within its boundaries and the subject of exclusive jurisdiction, on the ground that it interferes with the navigation of the bay or river, or gives out an offensive or unheathful odor? This court has not such jurisdiction.

The *county of New York* extends no farther than the middle of the river and bay. It only extends " to the west bounds of the state." (1 *R. S. 5th ed. p.* 130.) The " boundary" of the state is fixed by the treaty in the middle of the river and bay. (*Art.* 1*st, R. S. 5th ed. p.* 81. The first judicial district embraces only the city and county of New York. An action to abate a nuisance is in its nature local. (*See infra.*)

The sheriff of New York can execute no process without the *boundaries* of the state, except such as is in terms described in the seventh article of the treaty.

Practically, the contest here is between the two states, New York and New Jersey, to settle the construction and effect

of this treaty. But New York cannot implead the state of New Jersey in our courts, nor compel her appearance, nor enforce against her such a decree as is sought. This is an attempt to accomplish the result indirectly. It is not fitting nor proper for the courts of either state to assume jurisdiction, to control the use or improvement of real estate within the boundaries of the other. If there be any wrong, the remedy should be pursued in that high tribunal which is clothed by the constitution of the United States with jurisdiction.

V. The subject over which jurisdiction is claimed is real estate, and its use and enjoyment. 1. It follows from the principles already stated, and is an incontrovertible rule of international law, that real estate within the *territorial limits* of a state is governed by the laws of that state. Where New Jersey exercises her right to construct wharves, reclaim lands, &c. the jurisdiction of New York is *pro tanto* displaced. (*See U. S. v. Crosby,* 7 *Cranch,* 115. *Clark* v. *Graham,* 5 *Wheat.* 597. *Kerr* v. *Mason,* 9 *id.* 566. *Holmes* v. *Remsen,* 4 *John. Ch.* 460. 20 *id.* 254. *Hosford* v. *Nichols,* 1 *Paige,* 220. *Chapman* v. *Robertson,* 6 *id.* 627, 630.) 2. The jurisdiction conferred on New York is not inconsistent with the right of New Jersey to make wharves, reclaim lands, &c. That jurisdiction was of waters and lands under water, as *waters* and lands *under water.* When, in fact, reclaimed, the jurisdiction does not embrace them. 3. The action is local. Real actions must be brought in the place, *rei sitæ.* In respect to immovable property, every decree of a tribunal without the territorial limits of the state is utterly nugatory, and incapable of enforcement *in rem.* (*Story's Conflict of Laws,* § 551.) So of mixed actions so far as they concern the reality. (*Story,* § 552.) An action on the case for an injury to real property situated in another state, cannot be maintained in the courts of this state. (*Watts* v. *Kinney,* 6 *Hill,* 82. 23 *Wend.* 484.) So actions, although brought merely for damages occasioned by injuries to *real* property, as trespass or case for *nuisances,*

&c. are *local.* (1 *Chit. Pl.* 298, *ed. of* 1833. *Livingston* v. *Jefferson,* 1 *Brock.* 203.)

4th. The cases which permit a court of equity to hear and determine the rights of persons who may be within their jurisdiction by a decree *in personam,* to be executed *in personam,* do not apply to this case. An action to recover possession by decree *in personam* that defendant *surrender the possession* of lands out of the state, would be practically ejectment in a new form. The distinctions pertaining to this subject are clearly stated in *Gardner* v. *Ogden,* (22 *N. Y. Rep.* 327.) And in *Cumberland Coal Co.* v. *Hoffman Steam Co.* (30 *Barb.* 159,) it was held that the courts of this state *would not take* jurisdiction of an action between companies of another state to set aside, *for fraud,* a conveyance of lands in such other state.

This action is in substance a proceeding *in rem.* A decree *in rem* is sought. The abatement of the alleged nuisance is to be done by acting on the property itself. That cannot be compelled by any process against the defendants. This court can commission no officer to execute such a decree, not only without the county of New York, but within the declared boundary of New Jersey.

INGRAHAM, J. The *first* ground of objection to the complaint is the want of jurisdiction over the defendants.

The defendants are a foreign corporation. If it were necessary to proceed against them by attachment, to compel their appearance, the objection might have weight. Such is not this case. The defendants have appeared, and so far as respects bringing them into the court, and within its jurisdiction, that has been done by their voluntary act. Where a foreign corporation, by its officers, comes within this state, it becomes subject to the laws of the state, and to the process of the courts ; and where such a corporation, by its officers, is guilty of a wrong, or commits a trespass, within the state, I know of no rule by which such a corporation can es-

The People *v.* Central Railroad of New Jersey.

cape the consequences of its illegal acts, by setting up that it holds its existence under a foreign government.

For the purpose of this question, we must assume that the plaintiffs claim to have a right to the waters in the river where the defendants have taken possession. By the demurrer, they admit having taken such possession, and that they threaten to continue such possession, and to extend it. By the 134th section of the Code, service may be made on the officers of a foreign corporation in this state, or where the cause of action arose therein. What mode of service was adopted does not appear from the complaint ; nor is it necessary to state, in the complaint, the mode by which it is expected to acquire such jurisdiction over the defendants.

We have these facts, then, viz. a claim of title to, and jurisdiction over the waters where the defendants have taken possession ; they, by their officers, then being in possession, and without authority from the plaintiffs, show sufficient facts to give jurisdiction, if the process can be served on the defendants. If there is an improper service, that must be remedied by a motion.

*Second.* The remaining grounds are, that the court has no jurisdiction of the subject of the action, and that the facts do not constitute a cause of action.

The decision of these questions depends upon the views which are taken of the acts of the defendants, and, to some extent, renders an examination necessary as to the right of the plaintiffs to maintain any action for acts done in the river, west of the center line thereof.

This right, if it exists, is to be found in the agreement or treaty made between the states of New York and New Jersey, in 1833.(*a*)

(*a*) That agreement or treaty was as follows :

"ARTICLE I. The boundary line between the two states of New York and New Jersey, from a point in the middle of Hudson river, opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of said river, of

There is no doubt that, in navigable waters, where the tide ebbs and flows, the sovereign is the owner of the soil under the water, and of the waters which cover it. And where such waters form the boundary between two nations, such ownership is vested in each, to the portion of the stream adjoining the territory and extending to the center.

These rights may be varied by treaty, or by original grants or prior possession. I do not deem it necessary to enquire what rights the state of New York possessed to this portion of the river, prior to 1833. Whatever those rights were, they were all merged in the provisions of that agreement. By that instrument, the center of the river and bay was adopted as the boundary line between the states of New York and New Jersey, on that part of the river where these encroachments have been made.

By the third article of the agreement, the exclusive right of property in and to the land under water, lying west of the middle of the bay of New York and west of the middle of that part of the Hudson river, was declared to be the prop-

the bay of New York, of the waters between Staten Island and New Jersey, and of Raritan bay to the main sea, except as hereinafter otherwise particularly mentioned.

ARTICLE II. The state of New York shall retain its present jurisdiction of and over Bedlows and Ellis' Islands, and shall also retain exclusive jurisdiction of and over the other islands lying in the waters above mentioned, and under the jurisdiction of that state.

ARTICLE III. The state of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the bay of New York, and of and over all the waters of Hudson river lying west of Manhattan Island, and to the south of the mouth of Spuytenduyvel creek, and of and over the lands covered by the said waters, to the low water mark on the westerly or New Jersey side thereof, subject to the following rights of property, and of jurisdiction of the state of New Jersey, that is to say:

1. The state of New Jersey shall have the exclusive right of property, in and to the land under water lying west of the middle of the bay of New York, and west of the middle of that part of the Hudson river which lies between Manhattan Island and New Jersey.

2. The state of New Jersey shall have the exclusive jurisdiction of, and over the wharves, docks and improvements made, and to be made, on the shore of the said state, and of and over all vessels aground on said shore, or fastened

The People *v.* Central Railroad of New Jersey.

erty of New Jersey, and by the same article the state of New Jersey was to have exclusive jurisdiction over the wharves, docks and improvements *made and to be made* on the shore of that state.

If we were to stop here, there would be no difficulty in disposing of this case. The title to the land under water, in the sovereign, includes all right to the waters, even the land, and vests in the sovereign the sole right of jurisdiction, and, of course, the right to control the encroachments upon such waters.

The other provisions, however, of this treaty alter materially the rights of the parties. The first part of the third article gives to the state of New York exclusive jurisdiction *over all the waters* of the bay, and all the waters of Hudson river, and of and over the lands covered by said waters to low water mark on the New Jersey shore, subject to the right of property in the land therein given to New Jersey. The whole case resolves itself into the inquiry, whether a jurisdiction in

to any such wharf or dock; except that the said vessels shall be subject to the quarantine or health laws, and laws in relation to passengers, of the state of New York, which now exist, or which may hereafter be passed.

3. The state of New Jersey shall have the exclusive right of regulating the fisheries, on the westerly side of the said waters, provided that the navigation be·not obstructed or hindered.

ARTICLE IV. The state of New York shall have exclusive jurisdiction of and over the waters of the Kill Van Kull, between Staten Island and New Jersey, to the westernmost end of Shooter's Island, in respect to such quarantine laws and laws relating to passengers as now exist, or may hereafter be passed under the authority of that state, and for executing the same; and the said state shall also have exclusive jurisdiction, for the like purposes, of and over the waters of the sound, from the westernmost end of Shooter's Island to Woodbridge creek, as to all vessels bound to any port in the said state of New York.

ARTICLE V. The state of New Jersey shall have and enjoy exclusive jurisdiction of and over all the waters of the sound, between Staten Island and New Jersey, lying south of Woodbridge creek, and of and over all the waters of Raritan bay, lying westward of a line drawn from the light-house at Prince's bay to the mouth of the Mattavan creek, subject to the following rights of property and of jurisdiction of the state of New York:

1. The state of New York shall have the exclusive right of property in and

the state of New York, exclusive over the waters of the river and over the land under the water, while the fee of the land has been vested in another party, (New Jersey,) gives a right of property therein sufficient to maintain an action for an encroachment upon it.

It must be remembered that these grants, on both sides, are between the sovereigns, and are not subject to the ordinary rules applicable to grants made to a subject or citizen. The sovereign power can grant all it possesses, or may grant a part and retain a part; and a grant of the land to one and a reservation of the water to the other, vests in the grantees all the rights which the sovereign originally had in the part granted, or reserve to the grantor all rights in the part reserved, which was not intended to be conveyed.

By the treaty, the right to the soil is transferred to New Jersey, while the exclusive jurisdiction of and over all the waters of the bay and river to the low water mark, on the New

to the land under water lying between the middle of said waters and Staten Island.

2. The state of New York shall have the exclusive jurisdiction of and over the wharves, docks and improvements, made and to be made, on the shore of Staten Island; and of and over all vessels aground on said shore, or fastened to any such wharf or dock, except that the said vessel shall be subject to the quarantine or health laws, and laws in relation to passengers of the state of New Jersey which now exist, or which may hereafter be passed.

3. The state of New York shall have the exclusive right of regulating the fisheries between the shore of Staten Island and the middle of the said waters. provided that the navigation of the said waters be not obstructed or hindered.

ARTICLE VI. Criminal process, issued under the authority of the state of New Jersey, against any person accused of an offense committed within that state; or committed on board of any vessel being under the exclusive jurisdiction of that state, as aforesaid; or committed against the regulations made or to be made by that state, in relation to the fisheries mentioned in the third article; and, also, civil process issued under the authority of the state of New Jersey, against any person domiciled in that state, or against property taken out of that state to evade the laws thereof, may be served upon any of the said waters within the exclusive jurisdiction of the state of New York, unless such person or property shall be on board a vessel aground upon or fastened to the shore upon the state of New York, or fastened to a wharf adjoining

The People *v.* Central Railroad of New Jersey.

Jersey side thereof, and of and over the lands covered by the waters, is granted to New York.

The question then arises, what is meant by jurisdiction, and whether such grant of jurisdiction conveys any right which can be the subject of an action.

This jurisdiction cannot be the mere right to serve process, either civil or criminal, for that is provided for by articles six and seven, and it is made coequal to both the contracting parties, and is not exclusive.

It is the jurisdiction granted by one sovereign power to another, and, in that case, it means the right of exercising authority, of governing and controlling. This right is granted by the state of New Jersey to the state of New York, and the right by that grant is made exclusive, both as to the land and the water, up to low water mark on the New Jersey shore. And this jurisdiction and control is exclusive, even of New Jersey, except in three particulars ; one, of title to the land under water ; one, of the jurisdiction over wharves, docks and

thereto; or unless such person shall be under arrest, or such property shall be under seizure, by virtue of process or authority of the state of New York.

ARTICLE VII. Criminal process, issued under the authority of the state of New York, against any person accused of an offense committed within that state ; or committed on board of any vessel being under the exclusive jurisdiction of that state, as aforesaid ; or committed against the regulations made or to be made by that state, in relation to the fisheries mentioned in the fifth article; and, also, civil process issued under the authority of the state of New York, against any person domiciled in that state, or against property taken out of that state, *to* evade the laws thereof, may be served upon any of the said waters within the exclusive jurisdiction of the state of New Jersey, unless such person and property shall be on board a vessel aground upon and fastened to the shore of the state of New Jersey, or fastened to a wharf adjoining thereto ; or unless such person shall be under arrest, or such property shall be under seizure, by virtue of process or authority of the state of New Jersey.

ARTICLE VIII. This agreement shall become binding on the two states when confirmed by the legislatures thereof respectively; and when approved by the congress of the United States."

The above agreement or treaty was ratified and confirmed by the legislature of New York, by an act passed February 5, 1834; (*Laws of New York,* 1834, *ch.* 8; 1 *Stat. at Large,* 1;) by the legislature of New Jersey, by an act passed February 26, 1834; and by an act of congress passed June 28, 1834.

improvements, and one, of the fisheries.   These three rights are reserved to New Jersey.   What are these rights ?   The rights to the soil would prevent the state of New York from granting to another the land under water on the New Jersey shore.   Such a grant, if made, must be made by the state that owns the fee.   The right to a jurisdiction over the wharves, &c., naturally follows from the other, and is the reservation of the title and control of the land after it is made out of the water, on the shore of the state.   The right to the regulation of the piling is immaterial to the questions before us.   These are all the powers reserved to New Jersey.   I cannot doubt but that this grant of exclusive jurisdiction to the state of New York, with the above exceptions, confers upon the state full power and authority to preserve the river and bay from injury by strangers having no authority so to act. The people of the state of New York have the sole right to exercise authority and control over the water, and the land covered by water, against all persons who have no right to take possession.   That they may have such an interest in the water alone as would enable them to maintain an action against persons who, without right, thus seek to interfere with that control or jurisdiction, I have no doubt.   It is not at all an uncommon thing for persons owning the bed of a river to convey to others a right to the water, and such a right may be protected and preserved by action, even against the grantee.   In *People* v. *Canal Appraisers,* (33 *N. Y. R.* 461,) Chief Justice Davies discusses, at great length and with great ability, the rights of the state to navigable waters, and, although not deciding any of the questions raised in this case, yet he shows there that, both in the water and on the land under the water, the sovereign power possesses rights and estates which may be preserved and protected.

If this were an action against the state of New Jersey, very different questions would arise.   It was in this view that the learned justice tried the case at the special term, and his decision is based more upon the right of New Jersey to build

wharves and piers on her shores than upon the real merits of the case, as presented on this demurrer. I am free to admit that the article which gives to New Jersey the exclusive jurisdiction over wharves, docks and improvements made, and to be made, upon the shore of that state, would, if New Jersey was the defendant, raise a question of much importance and difficulty. That such a clause might be construed as giving to New Jersey the right to build piers and wharves below low water, is apparent, for the state of New York never claimed to own above low water mark, and her rights are only recognized to that extent in this treaty, and the term shore must have a more extended construction than between high and low water mark, because the same word is afterwards used, as places where vessels might get aground while navigating the river.

But that case is not before us on this demurrer.

By the demurrer, the defendants admit that the plaintiffs have the sole and exclusive jurisdiction over the bay and water of the Hudson river, and of the land covered with water, to low water mark on the New Jersey shore, as stated in the agreement, between the states of New York and New Jersey ; that these waters are arms of the sea, in which individuals can have no right or title ; that the defendants have taken possession of a tract of land under water in said bay and river and displaced the water by filling in the same to the extent of eight hundred acres in a portion of the said bay and river over which the plaintiffs have exclusive jurisdiction ; that the defendants are engaged in filling in to a larger extent and will cause serious damage to the harbor of New York ; and that the said defendants are so doing, without any right and without any grant or permission of the plaintiffs. By their admissions the defendants appear as simple wrongdoers and trespassers, committing a serious injury to the rights and property of the plaintiffs, which they seek to restrain. I see no good reason why, under such a state of facts, the defendants should not be restrained from doing fur-

ther wrong and damage, until it appear that they have some better right and authority than their mere will and pleasure. To sustain this judgment would be an invitation to any body at their pleasure to sink blocks and piers in this portion of the river, regardless of the rights of New York.

Nor can it be said that it does not appear that this filling is not between high and low water mark and therefore not within the jurisdiction of the plaintiffs, because it is averred that this filled in ground has been connected with the main shore of New Jersey by a wooden tressle work about one mile in length. Even if it be conceded that after this land is made by the filling in, it becomes subject to the jurisdic-diction of New Jersey, still that does not relieve the defendants, because it is averred that they were engaged in the work and intend to extend their filling to a much larger extent; and as to that I have no doubt of the plaintiffs' right to interfere, until the defendants show some better authority than now appears in these papers.

I forbear to express any opinion upon the right claimed by New Jersey to build piers and wharves and make improvements on her shore. When the defendants by an answer claim that they have the authority of the state of New Jersey for their acts, that question will properly arise. It cannot be available on this demurrer.

Something was said about the extent of the county of New York, in connection with this action. The boundaries of the state extend to low water mark on the New Jersey shore. (1 *R. S.* 54.) That statute has not been altered. The county of New York, on its western boundary, extends to the west bounds of the state. (1 *R. S. 5th ed.* 3.) This description covers the disputed territory, so far as the boundaries are designated by any law of the state; so that the action is properly brought in this district.

The conclusion to which I have arrived is that the demurrer is not well taken; that the state of New York has such a right, title and interest in the waters of the bay and Hud-

son river as will enable them to maintain this action ; and that the defendants are mere trespassers, and show no defense thereto.

The judgment should be reversed, and judgment ordered for the plaintiffs on the demurrer, with leave to the defendants to answer on payment of costs.

LEONARD, J. concurred.

SUTHERLAND, J. dissented.

Judgment reversed.

[NEW YORK GENERAL TERM, April 1, 1867. *Leonard, Ingraham* and *Sutherland,* Justices.]