DUNLIETH & DUBUQUE BRIDGE COMPANY v. THE COUNTY
OF DUBUQUE.

1. **Practice:** JURY TRIAL: PROCEEDING TO CORRECT ASSESSMENT. In
proceedings for the correction of assessments of property for taxation
the parties are not entitled to a jury trial. Following *Davis v. The City
of Clinton, ante,* 549.

2. ———: PLEADING: APPEAL. The plaintiff appealed to the Circuit Court
from the decision of the board of equalization fixing the value of certain
property for taxation, the defendant alleging that the valuation was just
and fair. The court found the value fixed to be just, but that there had
been included in the assessment property not taxable in this State, and
deducted the value of such portion from the total valuation: *Held,* that
the defendant had no grounds for an appeal.

3. **State Boundary:** CHANNEL OF MISSISSIPPI RIVER. The word
"channel," as used in the act of Congress admitting Iowa into the
Union, and in the State Constitution, in defining the eastern boundary
of the State as the middle of the main channel of the Mississippi river,
has reference to the bed in which the main stream of the river flows, and
not to the deep water of the stream as followed in navigation.

*Appeal from Dubuque Circuit Court.*

TUESDAY, APRIL 5.

THIS case was brought to the Circuit Court by an appeal
of plaintiff from the action of the board of equalization of
taxes of Julien township, Dubuque county, in refusing to
reduce the valuation of the railroad bridge across the Missis-
sippi river, owned by plaintiff, and in increasing such valua-
tion. Upon a trial in the Circuit Court the assessment and
valuation of the bridge were reduced. Defendant appeals.
Other facts in the case appear in the opinion.

*W. J. Cantillon* and *D. S. Wilson,* for appellant.

*George Crane* and *Shiras, Van Duzee & Henderson,* for
appellee.

BECK, J.—I. The assessor of Julien township, wherein plaintiff's bridge is situated, assessed it at a valuation of $160,000. The description of the property as assessed is as follows: "The west part main bridge from center of main channel of river, road-bed, bridges and right of way from west bank of river to the Illinois Central depot, over and across the following lots," describing them. The board of equalization of Julien township increased the valuation and assessment to $200,000. From this action of the board plaintiff prosecuted an appeal to the Circuit Court, claiming that $100,000 "would be a fair valuation according to the rates at which other property in the township is assessed." The Circuit Court reduced the valuation to $133,333.

II. At the trial in the Circuit Court defendant demanded a jury, which was refused, and the cause was tried to the court. This ruling is the ground of defendant's first objection to the judgment of the court below. The precise question here presented, namely, whether in proceedings of this character trial by jury is authorized by the constitution and laws of the State, was determined at the present term of this court. See *Davis et al. v. City of Clinton et al., ante,* 549. We held that in proceedings for the correction of assessments of property for taxation the parties are not entitled to a jury trial. Further consideration of this question is not demanded in this case. Following *Davis et al. v. City of Clinton,* we hold that the Circuit Court did not err in refusing to submit the cause to a jury.

*1. PRACTICE: jury trial: proceeding to correct assessment.*

III. It was shown to the court by an agreed statement of facts that the main bridge which is the subject of the assessment in question consists of several spans and a draw, and is 1,760 feet in length. From the abutment upon the Illinois shore to the middle of the pivot pier which supports the draw is a distance of 430 feet. The pivot pier is in the middle of the main channel followed by vessels in the navigation of the river. The main body of water of the river

flows in the channel between the abutments of the main bridge, and is equal thereto in breadth. The approach to the main bridge from the Iowa shore consists of embankments and a bridge of ninety feet wide across a slough in which there is always flowing water. The length and character of this approach as shown by the agreed statement of facts need not be more particularly described. In making the assessment in question the bridge was valued to the middle of the pivot pier, which is, as we have seen, only 430 feet from the Illinois shore. The approach, consisting of the bridge across the slough, the embankment, etc., was assessed and valued as a part of the bridge, or rather the bridge and the approach were assessed together. The agreed statement of facts sets out the amount and value of the capital stock of the plaintiff, the bridge company, the amount of its bonded indebtedness, and the amount and value of its contingent fund and other assets. These matters need not be more particularly referred to, as, in the view we take of the case, they are unimportant. The assessment of all other property in Julien township is upon a basis of thirty-three and one-third per centum of its cash value. In addition to the facts agreed upon by the parties, the court found the following facts:

" 2. That the original cost of construction of the entire bridge property from the Illinois Central depot to the Illinois shore, and the right of way, being all the property covered by the assessment in question, and the four hundred and thirty feet remaining of the main bridge to the Illinois shore, was $714,000, of which sum the east eight hundred and eighty feet of the main bridge cost $361,000, and all the remainder of said property $353,000, and that the cost of said property if constructed on or about January, A. D. 1879, would have been from $500,000 to $550,000, the ratio of cost of the different portions of the bridge remaining the same as originally.

" 3. That the valuation is fixed by the board of equalization of the property assessed, to-wit: From the Illinois Cen-

tral depot to the middle of the draw or pivot pier, was not excessive, but was a fair valuation of said property upon the conceded basis of assessment in Julien township, and that said assessment should not be changed unless part of said property lies in the State of Illinois, and is, consequently, not legally assessable in Dubuque county.

"4. That the value of that part of the main bridge extending from the middle of the draw or pivot pier westerly four hundred and fifty feet, to the center of the main bridge, is substantially one-third part of the value of the entire property covered by the assessment in controversy, such ratio of value being based by the court upon a like ratio of cost of construction.

"5. The court holds as a matter of law that the evidence as to the cost of construction does not furnish a sufficient basis for the proper valuation of the property in question for purposes of assessment, but does furnish a proper basis for the ascertainment of the correct ratio of value of the different portions of said bridge property.

"6. Upon the facts admitted in said agreed statement, the court finds as a conclusion of law that the eastern boundary of the State of Iowa is at the center of the said main bridge, being the middle of the main stream or channel of the Mississippi river running thereunder, and distant eight hundred and eighty feet respectively from the Iowa and Illinois shores or banks.

"7. The court, therefore, further finds as a conclusion of law that the assessment in controversy, by including therein four hundred and fifty feet of the main bridge lying in Illinois, was to that extent illegal, and that said bridge company is entitled to have the assessment against it reduced one-third."

IV. The counsel for defendant insist that under the evidence and agreed statement of facts the bridge is shown to be 2.———:pleading: appeal. of a value greatly in excess of the assessment made by the board of equalization. It will be observed that the Circuit Court found that the value fixed by

the board of equalization upon the bridge was fair, and ought not to be reduced. This valuation was upon the bridge to the center of the pivot pier. But the court held that the bridge was not taxable by this State beyond the middle point of the bridge, and as the assessment covered the bridge for 450 feet beyond that point, the value of these 450 feet was added to the assessment, and in effect increased the value of the part of the bridge taxable in this State to the amount of the value of the 450 feet. The facts, in the view taken of the case by the court below,. really presents the case of the taxation of property not within the State. But as the value of a part of the bridge without the State is in effect added to the value of the part within, for the reason that these portions are assessed as a unit, the case apparently presents a question of over valuation of the part of the bridge situated within the State.

But the truth is that the Circuit Court did not change the valuation fixed by the equalization board; it simply deducted from it the value of the part assessed which is without the State. In this way, while the valuation was not changed, the value of the bridge not taxable was deducted from the assessment. The assessment, therefore, of the bridge situated within the State remains under the decision of the Circuit Court the same as it was fixed by the board of equalization.

The case was tried in the Circuit Court upon written pleadings filed in that court. The petition of plaintiff, the bridge company, shows that the township assessor valued the property at $160,000; that the board of equalization increased the valuation to $200,000, and that plaintiff appeared before the board of equalization asking that the assessment be reduced, which was refused. It is averred that the assessment is unjust and clearly excessive, and is out of proportion to the assessment of other property of the township, and that the sum of $100,000 would be a fair valuation according to the assessment of other property in the township.

To this petition defendant answered, denying generally its

allegations and averring "that the sum of $200,000 is a fair and just valuation of the property and effects of the plaintiff liable to "taxation."

The issue here presented involves the sufficiency and correctness of the valuation of $200,000 made by the board of equalization. The plaintiff charges that it is excessive; the defendant avers that it is fair and just. Now the court below found, as we have seen, this issue in favor of defendant. The defendant cannot in this court change the issue and deny that the assessment of the board of equalization is not fair and just, and insist that the assessment should be increased beyond the sum which is averred in its answer to be "fair and just." The Circuit Court sustained the valuation fixed by the board of equalization. If that judgment is sustained in this court defendant gains all it asked for in its answer. It cannot here ask that the assessment be increased. It has obtained all it sought in its answer, and has no ground of complaint. The plaintiff does not complain of the judgment of the Circuit Court. The valuation of the Circuit Court, being the same as that of the board of equalization, will, therefore, be sustained by this court without inquiry as to its correctness, as plaintiff does not complain thereof and defendant cannot.

It becomes, therefore, unimportant to inquire what elements ought to enter into the valuation of the property; whether the capital stock of plaintiff, its bonded indebtedness, its income, the amount and value of its contingent fund, its franchise and other assets of the corporation, ought to be considered in order to determine the actual amount of the assessment. These matters were urged in argument by defendant's counsel as proper elements to be considered by us in reviewing the judgment of the court below. But in the view we take of the case we are not permitted upon the grounds suggested to call in question the correctness of the valuation approved by the Circuit Court. We are, therefore, relieved of the duty of considering the arguments and au-

thorities advanced by counsel in support of their position in this branch of the case.

V. The views of the case which we have expressed leave but one question for our determination, namely: did the Circuit Court correctly hold that the middle point of the bridge, being the middle of the main stream of the river, is the boundary of the State? If the Circuit Court's solution of this question be correct, it follows that the part of the bridge east of that point, being in the state of Illinois, is not taxable in this State. We will now proceed to the consideration of the question just stated.

*3. STATE boundary: channel of Mississippi river.*

The act of congress of March 3, 1845, admitting Iowa into the Union, and the constitution of the State in its preamble, declare that the eastern boundary of the State shall be " the middle of the main channel of the Mississippi river." We must now inquire what line is indicated by the words "middle of the main channel." Defendant's counsel maintain that the deep water of the stream used in the navigation of the river is meant, while plaintiff's counsel insist that the words describe the bed in which the stream of the river flows. In the sense last expressed the word describes the bed over which the water flows, from bank to bank. The word when applied to rivers generally, without the purpose of describing their currents or navigable characters, we think, always bears the signification as expressed by plaintiff's counsel. This is its primary meaning. But like many other words of our language which are controlled in their signification by the subjects under discussion when they are used, the word channel, when employed in treating the subjects connected with the navigation of rivers, indicates the line of the deep water which vessels follow. In this sense it is familiarly used by the boatmen of the Mississippi river.

The word is used, in its primary meaning above indicated, to describe the course and place of streams that have ceased to flow, and to designate new beds of rivers which owe their existence either to natural or artificial causes. The geogra-

pher speaks of the channels of ancient rivers, in which no water now flows; great floods or the industry of men sometimes change the course of streams, it is said, by opening new channels. When the word is thus used it means the bed of the river from bank to bank. We think the word when·used without reference to navigation always has this meaning. That it is used in this sense in the act of congress admitting Iowa into the Union, and in the constitution of the State, plainly appears in view of thè following consideration. The Mississippi river along the Iowa border, as well as in almost all other parts of the stream, has numerous islands. Arms of the stream, called "sloughs," flow between them and the mainland, and separate the islands from one another. They of course have not the breadth of the main river, nor does the main body of water of the stream flow through them. The main river is always readily distinguished from the "sloughs". by its width and the volume of water found in it. These "sloughs" are sometimes narrow and deep on account of strong currents flowing through them. The course of navigation follows the deepest water; this is sometimes on one side of the river, and very near the shore, and sometimes on the other. Sometimes it is at right angles with the current, and not unfrequently the navigator in descending the river must direct his vessel against the current in order to keep in the deepest water. Changes are continually occurring in the line of deep water followed by the vessels, caused by the shifting nature of the sandbars everywhere found in the river. The course of navigation, which follows what boatmen call the channel, is extremely sinuous and often changing, and is unknown except to experienced navigators. On the other hand, the bed of the main river designated by the word ·channel, used in its primary sense, is the great body of water flowing down the stream; it is broad and well defined by islands or the main shore. It cannot be possible that congress and the people of the State, in describing its boundary, used the word channel to describe the sinuous, obscure and changing line

of navigation, rather than the broad and distinctly defined bed of the main river. The center of this river bed, channel, may be readily determined, while the center of the navigable channel often could not be known with certainty. The first is a fit boundary line of a State; the second cannot be.

The language describing the boundary is "the middle of of the main channel" of the river. This implies that the river has more than one channel. Each "slough" or arm of the river has its channel in the primary sense of the word. As the slough is a part of the river its channel may be properly called a channel of the river. Ordinarily there is but one line of navigation, for · it is always found in the deepest water, but it sometimes occurs that in the same part of the river there are two or more lines of navigation, one on the right and the other on the left, one in the main river and another through a slough, each equally deep and easy of navigation. Which of these shall be called the "main channel"? The adjective "*main*" as here used means principal. It is very plain that the words used in describing the boundary of the State, "main channel," could not be applied in such a case. But the principal channel of the river is the bed of the main stream and in all cases may be described as the main channel.

VI. The act of congress of April 18, 1818, enabling the people of Illinois to form as State government, provided that the western boundary of the State shall be "the middle of the Mississippi river." The same language is used in the constitution of the State to describe its western boundary. The line here indicated is the middle of the main stream of the river, the *filum aquæ*, and not the middle of the deep water used by vessels. It is very plain that in prescribing the eastern boundary if Iowa it was intended to be concurrent with the western boundary of Illinois. If this were not so, there would arise frequent occasions of conflict of jurisdiction between the two States, for if the Iowa boundary follows the navigable channel it would often over-lap the boundary line

of Illinois. And it would sometimes happen that parts of the river would be without the boundary line of either State. Other cogent arguments occur to our minds supporting our conclusions upon this branch of the case which we will not here present, as they are, we think, well sustained by those we have presented.

VII. The act of congress under which plaintiff was authorized to build its bridges provides that the draw shall be constructed " over the main channel of the river at an accessible navigable point."

Counsel for defendant insist that the plaintiff is estopped to deny that its draw is over the main channel of the river and that the main channel is the boundary of the State. The language of the act quoted will hardly support counsel's claim that the word channel is here used to designate the navigable channel. The qualifying words " at an accessible and navigable point" indicate that the draw shall be constructed over the navigable channel in the main *channel* of the river. The word channel, in this connection, may be understood according to its primary meaning, yet the qualifying words very plainly indicate that the draw is to be built over that part of the stream used for navigation.

But it may be conceded that the word channel, as used in the statute referred to, means the navigable part of the river. This is its secondary meaning which it bears in this instance because it is here used in connection with the subject of navigation, for the purpose of directing the construction of the draw over the deep water used in the navigation of the river.

The foregoing discussion satisfactorily disposes of the case, and leads us to the conclusion that the judgment of the Circuit Court ought to be

AFFIRMED.