Roberts v. Fullerton, 117 Wis. 222.

ROBERTS, Respondent, vs. FULLERTON, Appellant.

*February 7—March 21, 1903.*

*States: Boundaries: Rivers: Concurrent jurisdiction: Enforcement of fish and game laws.*

1. The boundary line of this state, as to its outlying rivers, is the main channels of such rivers.
2. The concurrent jurisdiction which this state has with the state of Minnesota on the Mississippi river is of a special nature,— one not incident to nor implying concurrent dominion over the territory covered by water between the two states, or concurrent ownership in such water or the land under the water, or the fish and game that inhabit the same.
3. The term "concurrent jurisdiction on the water," used in the acts of Congress providing for the admission of the states of Wisconsin and Minnesota into the Union, refers to the effect of the law of each state within the domain of the other covered by water divided by the boundary line between the two states, as regards persons or things on the water concerned or connected in some way with the use thereof for purposes of navigation. It has no reference to the land under the water or things of a permanent nature in or over the water. In respect to such matters and rights incident thereto, the jurisdiction of each state on its side of the boundary line is exclusive.
4. The enforcement by the state of Minnesota of its fish and game laws on the Wisconsin side of the main channel of the Mississippi river is not justifiable on the theory of common ownership of the river or things in or on or under the same on the Wisconsin side of the main channel.
5. The term "concurrent jurisdiction on the water" in the acts of Congress before referred to must be restrained to the ordinary meaning thereof in American public law at the time the term came into use in the legislative enactments of this country.
6. The concurrent jurisdiction above specified does not empower one state to regulate the individual enjoyment by people of another state within its boundaries, of property held in trust by such other state for the people within its limits, such as public water and the fish and game that inhabit the same.
    [Syllabus by MARSHALL, J.]

DODGE, J., dissenting, is of the opinion that this state, having decided that its concurrent jurisdiction enables it to define and

punish a crime upon boundary waters but in the territorial limits of Minnesota, cannot deny to that state the same right upon those waters.

APPEAL from an order of the circuit court for Pierce county: E. W. HELMS, Circuit Judge. *Affirmed.*

Action to recover damages for the taking of plaintiff's fish net from where it was located by him to catch fish in the waters of Lake Pepin, it being staked to the bottom of the lake, and for the destruction of such net. Defendant answered, admitting the allegations of the complaint and pleading in justification that he was an officer of the state of Minnesota duly authorized to execute its laws for the preservation of fish, and that in doing the act complained of he was in the performance of his official duties. Plaintiff demurred to the answer for insufficiency. The demurrer was sustained. This appeal is from the order entered thereon.

For the appellant there were briefs by *W. B. Douglas,* Attorney General of Minnesota, and *Frank C. Hale,* and oral argument by *Mr. Douglas.* They contended, *inter alia,* that the legislatures of both Wisconsin and Minnesota have declared that the title to the game and fish within their respective jurisdictions is vested in the state. Wis. Stats. 1898, sec. 4560; sec. 9, ch. 221, G. L. of Minn. 1897. Under such enactments, the title to the game and fish has uniformly been held to be vested in the state in its sovereign capacity and held in trust for the public. *State v. Rodman,* 58 Minn. 393; *Rossmiller v. State,* 114 Wis. 169, 89 N. W. 839; *Geer v. Connecticut,* 161 U. S. 519. It has been uniformly held that in navigable waters, the right of fishing was given to the entire general public; and it has always been held that the states bordering on such navigable waters have power to regulate the taking or killing of fish therein. *Lawton v. Steele,* 152 U. S. 133–138; *State v. Roberts,* 59 N. H. 256; *Smith v. Maryland,* 18 How. 71; *Comm. v. Chapin,* 5 Pick. 199; *Vinton v. Welch,* 9 Pick. 87–92; *Comm. v. Essex Co.* 13 Gray,

239–246; *Phelps v. Racey,* 60 N. Y. 10; *Gentile v. State,* 29 Ind. 409; *State v. Lewis,* 50 Ohio St. 179, 33 N. E. 405; *Hooker v. Cummings,* 20 Johns. 91; *Edson v. Crangle,* 62 Ohio St. 49; *Parker v. People,* 111 Ill. 588.

*Walter C. Owen,* for the respondent.

MARSHALL, J.   It is conceded, as the fact is, that if the laws of the state of Minnesota respecting the preservation of fish may be enforced by its officers upon the Wisconsin side of the main channel of the Mississippi river, which includes, of course, Lake Pepin, the answer of defendant states a complete justification for the acts complained of.   The question turns on the meaning of federal laws by which the states of Minnesota and Wisconsin were given concurrent jurisdiction on the waters of the Mississippi river.   The language of the two acts of Congress, the one relating to Wisconsin [Act of Aug. 6, 1846; 9 U. S. Stats. at Large, 57], and the other to Minnesota [Act of Feb. 26, 1857; 11 U. S. Stats. at Large, 166], is the same so far as applicable to difference in situation.   That as to Wisconsin (sec. 3) is as follows:

"The said state of Wisconsin shall have concurrent jurisdiction on the Mississippi and all rivers and waters bordering on the said state of Wisconsin, so far as the same shall form a common boundary to said state and any other state or states now or hereafter to be formed or bounded by the same."

The term "concurrent jurisdiction" does not imply, as the learned attorney general for the state of Minnesota seems to suppose, that the people of the two states in their sovereign capacities are joint owners of the bed of the Mississippi river within the scope of the enabling acts referred to, or of the waters of the river or the fish therein or things thereon, under the principle laid down in *Rossmiller v. State,* 114 Wis. 169, 89 N. W. 839.   Ownership in that sense does not follow jurisdiction, as the term was used in the enactments under discus-

sion.  It was competent for the national legislature, in the
formation of the states, to extend the laws of each for certain
purposes over territory of the other.  That was done, the ju-
risdiction *on* boundary waters being extended as to each state
from shore to shore, while the boundary line between them
was placed at the main channel of the river.  That necessarily
forms the boundary between them as to sovereign rights of
ownership.  Sovereign right as regards ownership of the bed
of the Mississippi river or anything permanently affixed
thereto coincides with territorial boundaries.  Therein, as to
everything of a tangible character forming part of the land,
whether above the water or below the water, the jurisdiction
of each state is exclusive.  It would seem that its authority
must be the same as regards sovereign property rights inci-
dent to sovereign ownership of the land covered by water.  If
there is anything decided in *J. S. Keator L. Co. v. St. Croix
Boom Corp.* 72 Wis. 62, 38 N. W. 529, to justify a contrary
idea—and it is believed there is not, it is to be regretted.  Cer-
tainly, it was not intended there to hold, as we understand
the matter, that the state of Minnesota has such jurisdiction
over or within or on Wisconsin territory on its side of the
main channel of the Mississippi river, or on water the main
channel of which forms the boundary line between the two
states, as will permit it to authorize, prohibit, regulate, or
take jurisdiction over, a permanent object in the river, nat-
ural or artificial,—anything not *on* the river within the mean-
ing of the term as used in the act of Congress; any jurisdic-
tion indicating sovereign property rights in Wisconsin terri-
tory.  The court seems to have clearly negatived any idea of
joint state dominion, in saying that neither state can take or
authorize the taking possession of any part of boundary wa-
ters from bank to bank, citing *President v. Trenton City B.
Co.* 13 N. J. Eq. 46, and *Att'y Gen. v. D. & B. B. R. Co.* 27
N. J. Eq. 631, both of which cases in effect decide that either

Roberts v. Fullerton, 117 Wis. 222.

state, subject to the right of navigation, may take possession of such waters for any lawful purpose out to its boundary line, not interfering with the right of navigation.

It seems that the learned attorney general for Minnesota has drawn a different idea of this court's decision in *J. S. Keator L. Co. v. St. Croix Boom Corp.* from our understanding of it and constructed thereon the theory that sovereign territorial rights between the shores of the river are common to the states of Minnesota and Wisconsin; that concurrent jurisdiction, as the term is used in the federal law, as viewed by this court, means concurrent dominion. We must repudiate that, and are constrained to believe that in doing so we do not need to overrule anything decided in the *Keator Case;* though we must confess, inasmuch as it dealt in some respects with permanent objects on the Wisconsin side of the main channel of the St. Croix river, language was used from which the broad idea entertained by counsel for appellant is not wholly without justification. It has been decided in many jurisdictions, including that of the supreme court of the United States, that "concurrent jurisdiction on the river" extends only to the water and to floatable objects therein, not to bridges, dams, or any other objects of a permanent nature. If any such object be located upon the Wisconsin side of the main channel of a boundary river so as to constitute a nuisance, it must, accordingly, be deemed not only wholly within the territorial limits of Wisconsin, but within its exclusive jurisdiction. *Mississippi & M. R. Co. v. Ward,* 2 Black, 485; *Gilbert v. Moline W. P. & M. Co.* 19 Iowa, 319; *Dunlieth & D. B. Co. v. Dubuque Co.* 55 Iowa, 558, 8 N. W. 443; *Buck v. Ellenbolt,* 84 Iowa, 394, 51 N. W. 22; *Iowa v. Illinois,* 147 U. S. 1, 13 Sup. Ct. 239. The rule laid down in those cases has been uniformly accepted by all courts as sound. The effect thereof is that there is no such thing as concurrent ownership, so to speak, of territory, or incidents thereof, between

the shores of a river divided by the boundary line between this state and the state of Minnesota.

Having reached the conclusion that the laws of Minnesota do not for any purpose extend over the territory on the Wisconsin side of the main channel of the Mississippi river, except as regards things on the river—things of a floatable nature,—we are now to inquire whether by reason of respondent's net being retained in place by means of stakes driven in the bed of the lake, it partook of the nature of a permanent object in the river rather than of a floatable object or thing on the river. Counsel for respondent *ex industria* added an allegation to the complaint stating the fact that the net was fastened to the bed of the lake by stakes. We do not deem that circumstance material. The net was no more an object of a permanent nature and part of the land, so to speak, to which it was attached, than a boat anchored in a stream temporarily. It was located where found for a purely temporary purpose. It was not put in place by acts on the water. The dividing line of jurisdiction as to physical objects is between those on the river and those forming a part, not of the river, strictly speaking, but of the river bed. *Gilbert v. Moline W. P. & M. Co., supra.* The plaintiff's net was an object of a transitory nature. It was liable to be moved about from place to place by enjoying the river as navigable water. The act of plaintiff, it seems, was an act in a fair sense connected with the use of the river as navigable water and subject to be dealt with by the jurisdiction of either Wisconsin or Minnesota if the term "concurrent jurisdiction" refers to the regulation of such matters.

We have now reached these conclusions in the course of our considerations: (1) All the territory within the banks of the Mississippi river on the east side of the main channel thereof, so far as the river forms a boundary between Minnesota and Wisconsin, is exclusively Wisconsin territory, with all the in-

cidents thereof except as modified by the provision of the federal law giving to the state on the opposite side of the main channel of the river concurrent jurisdiction with Wisconsin on the river on the Wisconsin side.   (2) Jurisdiction on the river does not include jurisdiction of objects in the river above or below the surface, whether natural or artificial, so attached to the river bed or bank of the river as to form a part of the land itself.   (3) The state of Minnesota has no jurisdiction to abate a nuisance consisting of a permanent object in the river or over the river on the Wisconsin side of the main channel.   (4) The property of the plaintiff which defendant destroyed did not at the time of its destruction constitute such an object.   (5) The placing of the plaintiff's net in the river where found was connected with the use of the river as navigable water.   (6), The enforcement of the law of Minnesota regarding the enjoyment of the right to fish in the Mississippi river on the Wisconsin side of the main channel cannot be justified by reason of the common ownership by the former state or by the people thereof in their sovereign capacity, either in the bed of the river or in the water thereof or the things animate or inanimate therein.   (7) The meaning of the language of the federal law giving concurrent jurisdiction on the waters of a boundary river is to be restrained to the purposes thereof.   For all other purposes the jurisdiction of each state on its side of the main channel of the river is exclusive.   For examples: One state can neither authorize nor abate a permanent object in the river within the territory of the other; it cannot tax property either in the river or on the river on the opposite side of the main channel thereof. *Dunlieth & D. B. Co. v. Dubuque Co.* 55 Iowa, 558, 8 N. W. 443.

We are not unmindful of the fact that in *J. S. Keator L. Co. v. St. Croix Boom Corp.* it was suggested that the term "concurrent jurisdiction" includes the exercise of all legal authority by each state over the whole river.   Upon that, in

part, counsel for appellant, we apprehend, pins his faith in insisting that the territory within the banks of the boundary river is common property of the two states. The inference that counsel draws is not wholly without warrant, looking to the words under consideration in their broad, general sense. The court did, in effect, say that the term "jurisdiction" as used at the time of the federal enactment in question, generally speaking, refers to the three co-ordinate branches of the government, legislative, executive and judicial, and that it must be assumed that Congress used the term in that sense. In that and what the court further said—while we confess there is some warrant for the inference that it was at least suggested that each state may exercise its whole sovereign authority over and in the waters of a boundary river between the banks thereof so far as it can consistent with the other state exercising like authority—there is unmistakable evidence that the court did not intend to so decide. Speaking of the effect of the general grant of authority to construct and maintain booms and piers on the St. Croix river contained in the Minnesota law, this language was used:

"It does not in terms give such authority upon lands or waters of Wisconsin. Since the charter was granted by Minnesota alone, the defendant's authority to so enter upon and occupy would seem to be confined to the territory of Minnesota, and in no event to reach beyond its jurisdiction. The line between the two states at the point in question is the main channel of the St. Croix."

There would not seem to be much doubt that if we were to take the view which counsel for appellant does of the scope of the decision in the *Keator Case,* and adhere to it as the law, and defendant would in his own state be protected in what he did by its laws, he should be held equally protected by the laws of this state. Its jurisdiction is not invoked to enforce the law of Minnesota, but simply to protect its officer in the enforcement of its own laws within the territory within which he had a right to go for that purpose if the

whole authority of his state could be legitimately exercised therein. However, we cannot come to the conclusion that "concurrent jurisdiction" was used by Congress in the broad sense of whole sovereign authority. That would be inconsistent with the decision of the federal court in *Mississippi & M. R. Co. v. Ward,* 2 Black, 485, as we have seen. It held, in a situation similar to the one involved here as regards the concurrent power of two states, that a permanent object in the river on one side of the main channel thereof, being wholly within the territorial limits of the state on that side, is subject to judicial control solely by the courts of and for such state. Following that, as we have seen, courts have universally held that the words "concurrent jurisdiction on" the river have reference only to violations of law on the waters of the river, actually or constructively. In *Buck v. Ellenbolt,* 84 Iowa, 394, 51 N. W. 22, it was held that the effect of *Mississippi & M. R. Co. v. Ward* was to restrict the words "concurrent jurisdiction" to actions in some way connected with the navigation of the river,—things on the river. This language was used:

"It has never been held that the jurisdiction of this state extends to the east shore of the channel of the Mississippi in any case except where the act complained of or cause of action was founded upon something connected with the commerce of the river."

That statement, of course, was not intended to exclude the mere arrest or service of process on the river as regards causes of action accruing elsewhere. It should be restrained to just what the court was discussing, that is, to causes of action arising on the river within the boundaries of one state which are cognizable in the courts of the other state. By reference to the former decision of the court (*Gilbert v. Moline W. P. & M. Co.* 19 Iowa, 319) the court said, in effect, that concurrent jurisdiction on the river was given so that causes of action, civil and criminal, accruing upon the water might be prosecuted in the courts of either state, and that for the purposes

of each such cause of action the courts of each state should deem its laws extended to the opposite shore.

We should observe in passing that in the *Keator Case* the decision in the federal supreme court in *Mississippi & M. R. Co. v. Ward* was referred to and the force thereof as regards restricting the meaning of the term "jurisdiction on the river" to narrower limits than the whole sovereign power of the state was observed. But it was in effect suggested that the court could not see that such case applied to the boundary rivers of this state, since the states on both sides of the boundary have concurrent jurisdiction over the waters, while, so far as advised, the state of Iowa did not have concurrent jurisdiction with the state of Illinois over the Mississippi river between the two states. The court failed to discover, as the fact is, that the act admitting Iowa into the Union contains precisely the same provision as that in regard to this state in respect to concurrent jurisdiction over boundary waters. The act will be found set out in full in the Annotated Code of Iowa, published in 1897, at page 55. That particular part material to our consideration is on page 56 and contained in sec. 3. Here is the language:

"The said state of Iowa shall have concurrent jurisdiction on the river Mississippi, and every other river bordering on the said state of Iowa, so far as the said rivers shall form a common boundary to said state and any other state or states, now or hereafter to be formed, or bounded by the same; such rivers to be common to both."

We should also not fail to note that this court, in *State v. St. Croix Boom Corp.* 60 Wis. 565, 19 N. W. 396, in harmony with *Mississippi & M. R. Co. v. Ward,* held that though the jurisdiction of the state of Wisconsin and that of Minnesota is concurrent on the St. Croix river between the two states, the jurisdiction of this state as regards obstructions in the river could not extend beyond the main channel thereof.

We have still to determine whether the concurrent jurisdiction under discussion permits one state to invade another

and regulate common rights of fishing therein.   In none of
the cases to which we have referred are we able to find the
term "concurrent jurisdiction on the river" accurately de-
fined.   That it has a specific rather than a general meaning,
however, is plain from what has been said.   The meaning is
something less than whole sovereign authority of the states.
All the cases in other jurisdictions that we have discussed are
to the effect that it pertains only to acts or causes of action
on the water or in some way connected with the navigation
thereof, or floatable purposes of some kind, or to the service
of process upon persons while on the water in some sense.
But the precise reason for the restricted meaning of the law
is nowhere very satisfactorily given, that we have been able to
discover, so that we may see just what subjects jurisdiction on
the water extends to.   It is said that the purpose of conferring
concurrent jurisdiction was to render immaterial, in the courts
of the state assuming jurisdiction over a particular matter,
upon which side of the main channel of the river it happened.
Undoubtedly the term had a well-understood meaning at the
time the act was passed admitting or enabling Wisconsin to
be admitted into the Union.   Many similar acts had thereto-
fore been passed by the national Congress.   The set phrase
"jurisdiction on the river" had theretofore been used in all of
them and in many laws or compacts between the states or be-
tween the states and the general government, or between the
colonies, reaching back to a period before the formation of the
national constitution.   There is an identity of language in
the various provisions on the subject from first to last, indi-
cating a pretty well understood purpose at the beginning.
That purpose, doubtless, though not definitely understood
from the adjudications on the subject, has been carried for-
ward to this day.   Certainly, authority in this country has
been concurrently exercised uniformly by states or govern-
ments upon boundary waters, and it has been as uniformly
called "concurrent jurisdiction on the river (or water)."   In

very early decisions it will be found that, without referring to any specific law on the subject, concurrent jurisdiction upon boundary waters was recognized to exist. Before the formation of the national constitution the state of Virginia and the state of Maryland, by some sort of compact, exercised authority which was denominated "concurrent jurisdiction on the waters" washing their respective shores. In the Virginia act of December 18, 1789, creating the District of Kentucky as a state, it was provided that "jurisdiction on the river, &c., shall be concurrent." Rev. Code of 1819 (Va.) vol. 1, p. 59; 1 Gav. & H. Stats. Indiana, 57. A similar provision was made in ceding the Northwest Territory to the United States. In *McFall v. Commonwealth,* 2 Met. (Ky.) 394 (decided in 1859), regret was expressed that even at that late day the exact scope of the term was not plain beyond reasonable controversy. These remarks were made by the court:

"It is a part of the legislative history of the country that negotiations having in view the settlement of the question have been several times attempted. And it may not be out of place here to express the hope that the whole subject may be finally disposed of in such manner as to secure the concurrent rights of, and to preserve the amicable relations which should continue to subsist between, the several states interested in its adjustment."

Though it was not necessary in that case to even attempt to decide the controversy suggested, the court ventured to say that "the word *jurisdiction,* as applied to a state, and as used in the compact with Virginia, imports nothing more than the power to govern by legislation." In connection with that the court suggested that, without some legislative enactment to enforce and carry out the jurisdiction conferred, it would not of itself be regarded as operative or effectual to protect a person in the courts of one state or affect the right of a tribunal in such state as to the enforcement of its laws made with a view to such jurisdiction.

Going back from the Virginia enactment to which we have

referred, we find that the provision as to concurrent jurisdiction on water like a lake or river divided by the boundary line between two sovereignties was but an embodiment of international law. Without any compact between the sovereignties so divided, they were accustomed to exercise concurrent jurisdiction on the same from the law of necessity. So, jurisdiction was not so much conferred in the various instances where the language under consideration was used in compacts or other laws, as it was declared and confirmed. Gardner's Institutes, p. 210. That author, at page 209, says:

"It is a principle of American public law that where the middle of a navigable river, lake, or bay, forms the dividing line of states, or an intangible line upon their waters, a concurrent jurisdiction, civil and criminal, arises over such waters to the states upon the opposite shores. It extends over the whole of the dividing waters, unless it was otherwise stipulated before the adoption of the constitution of the Union by state compact, or since, by such compact, with the assent of Congress."

That is, according to the author, the concurrent jurisdiction upon boundary waters is presumed to exist by the law of nations and by public law in the absence of some written law to the contrary. Such declarations as that contained in the Virginia act of 1789, and those that have been modeled thereon, including those involved in this case, are but declarations of existing law,—law that would be assumed to govern in the absence of some written law to the contrary. The author we have quoted further says (page 210):

"The same principle is applicable to all cases among nations where their boundaries divide navigable waters. The line being incapable of sight and ready perception, a concurrent jurisdiction, of necessity, must exist on the dividing waters. The navigable rivers, bays and great lakes divided by the boundaries of our republic and the British provinces and Mexico, are, by national comity and necessity, subject to such concurrent jurisdiction.

"In all cases of such jurisdiction the state first arresting or prosecuting a party is, by comity, entitled to proceed to final judgment; and that is a bar to any retrial by any other state of our Union for the same cause or offense."

That is in harmony with *Sherlock v. Alling,* 44 Ind. 184.

Without proceeding further in our investigations we are satisfied that the term "concurrent jurisdiction" was used in the acts admitting or providing for the admission of Wisconsin and Minnesota into the Union in the same sense in which it had theretofore been used as applicable to similar situations, both in written and unwritten laws,—in the same sense that it is said concurrent jurisdiction exists by comity of nations upon waters divided by their boundary line unless otherwise provided by some written law.

Tested by the principle above adopted, do the mere police regulations of one country regarding the exercise of the common right of fishing extend into the territory of a foreign jurisdiction, the two being separated by an imperceptible boundary line in a river or lake? Is the common right of fishing which belongs to the people of this state within all that part of its territory on the easterly side of the main channel of the Mississippi river subject to the laws of the state of Minnesota? There is no escaping the conclusion that if such is the case it is competent for that state to extend its police regulations as regards fishing and hunting over a large part of the waters of Lake Superior on the Wisconsin side, reaching up to the shore line, and for the state of Michigan to extend its laws on Lake Michigan on the same subject to the Wisconsin shore. We have searched in vain to find authority to sustain the affirmative of the proposition suggested. In no instance recorded in the books has one country been held entitled to exercise jurisdiction to regulate the common right of fishing in the territory of a foreign state under the measure of concurrent jurisdiction commonly exercised by the two on the waters divided by their boundary line. We venture

to say that such concurrent jurisdiction has never been suc-
cessfully invoked to justify interferences by one state or coun-
try with the enjoyment of the right to fish within the terri-
torial boundaries of the other.   It would be foreign to the
necessities of this case to enter into a discussion regarding
the limits of that juridiction.   It is sufficient for this case
that we have reached the conclusion that, while it refers to
acts of a criminal or civil nature on the water, or acts in some
way connected with the use of the water for navigable pur-
poses, it does not extend to the right of one state by legisla-
tive enactment to govern the fishery rights of the people in a
foreign jurisdiction.   As we have before seen, this country
and the British provinces exercise concurrent jurisdiction
over the waters divided by their boundary line, and the same
is true as to this country and Mexico.   No one would venture
to say that one country could enforce its laws for the preser-
vation of fish or regulating the taking of fish within the
territorial limits of the other.   It is to be regretted that the
nature of the authority on waters of the Mississippi exercis-
able by Wisconsin and Minnesota has not been heretofore
definitely decided.   No court has yet dealt with the subject,
or the meaning of the language requiring construction in
similar situations, so as to cover the whole thereof satis-
factorily, if at all.   Many judges have deplored the uncer-
tainty existing, but have found a convenient way of escaping
the labor of removing it.   The interests at stake are so great
that it is not to be wondered that any one appreciating the
same should hesitate long before entering upon the difficult
task of solving completely the troublesome question suggested.
There is a consensus of opinion that concurrent jurisdiction
does not mean concurrent dominion, and that it refers only
to things afloat or on the water in some reasonable view of
the situation, or so circumstanced as to be legitimately re-
garded as connected with the use of the water for navigable

purposes. That is about as far as the courts have gone. In *Gardner's Case,* 3 Grat. (Va.) 655, 676—a case decided in a jurisdiction where, if anywhere, we would expect the term under discussion to have had a well-defined and well-understood meaning at an early day—while the judges in lengthy opinions severally referred to it, not one of them attempted to define it. Judge TALIAFERRO said, it refers "only to things afloat" at best. "The question is a very important one and I decline stating any opinion, when it does not necessarily arise in the case." Justice FRY said (page 752): "What is the precise meaning of 'concurrent jurisdiction' I am not prepared to say. It strikes me as equivalent to 'common.'" It is our opinion that the term refers to that authority commonly exercised concurrently upon water divided by the boundary line between two countries, according to the public law as recognized in this country at the time the use of the term became common in our legislative history; that it relates to matters at least in some way connected with the use of the water for navigable purposes, to things afloat, or in some legitimate sense on the water—things difficult to deal with if it were necessary to determine in each instance of the exercise of jurisdiction the precise location of the particular act involved as regards the boundary line; but that it does not include the right to regulate the enjoyment, by the people of one state within its domain, of rights incident to their situation, such as the right to navigate or fish. It does not empower one state to spread its mere police regulations over territory of another, regulating the sovereign property right of the latter in or to the water flowing over such territory, or to the fish therein or fowls thereon, which it holds in trust for the enjoyment of the whole people within its boundaries, in their individual capacities, under such legal restraints as such other, in its legislative wisdom, may see fit to impose,— so long as such enjoyment does not interfere, unlawfully,

with like enjoyment by the people of the state on the opposite side of the boundary.

The result is that the order of the circuit court sustaining the demurrer must be affirmed.

*By the Court.*—So ordered.

Dodge, J. I cannot concur in the conclusion reached by the court in this case, for the reason that I am unable to distinguish between criminal and police legislation of the state addressed to the subject of catching or destroying fish, and police or criminal legislation relating to other subjects. That the concurrent jurisdiction enjoyed by the several states of the Union over the water boundaries separating them from other states includes the promulgation of such legislation extending over such boundary waters, and the enforcement thereof in the manner prescribed by such legislation, whether by courts or by executive officers, is supported by the whole current of authority, and, so far as my examination has gone, is denied by no decided case. In *McFall v. Commonwealth,* 2 Met. (Ky.) 394, it is said, "Jurisdiction, . . . as used in the compact (for concurrent jurisdiction), imports nothing more than the power to govern by legislation," and in that case was sustained a conviction of an Ohio justice of the peace for solemnizing a marriage midway upon the Ohio river, contrary to the statutes of Kentucky, for the reason, expressly stated, that no statute of Ohio expressly authorizing him so to do had been pleaded or shown. In *Carlisle v. State,* 32 Ind. 55, it was held that the statutes of Indiana prescribing the facts which should constitute murder, and the punishment therefor, applied to an offense committed outside of its territorial boundary, but upon the Ohio river, over which that state has concurrent jurisdiction. In *Sherlock v. Alling,* 44 Ind. 184, and *Memphis & C. P. Co. v. Pikey,* 142 Ind. 304, 40 N. E. 527, it was held that the statutes of Indiana imposing liability in damages for negligently

causing death extended over the Ohio river by virtue of the same provision, and applied to persons navigating the same, independent of citizenship. In *Dugan v. State,* 125 Ind. 130; 25 N. E. 171, laws prohibiting Sunday labor were held so applicable to one acting as a pilot upon the river, but not engaged in interstate commerce; and in *Welsh v. State,* 126 Ind. 71, 25 N. E. 883, a statute prohibiting the sale of intoxicating liquor without a license was so applied. In *State v. Mullen,* 35 Iowa, 199, a statute of Iowa against maintaining a house for prostitution, and authorizing its seizure and condemnation, was held to apply to a houseboat moored on the Illinois side of the Mississippi river, and to justify arrest of the offender there, and seizure and condemnation of the offending implements and property. In *State v. George,* 60 Minn. 503, 63 N. W. 100, the concurrent jurisdiction was held to warrant conviction under the Minnesota laws for larceny committed on a bridge across the Mississippi river, at a place east of the center of the stream, and therefore over Wisconsin territory; the court having first held that the act upon the bridge crossing the river was equivalent to the same act upon the surface of the river. It was there said: "Some of the purposes of this concurrent jurisdiction are to enforce proper police regulations on the river." The principle of these cases was adopted at a very early day in Wisconsin in *State v. Cameron,* 2 Pin. 490, 495, where it was decided that, by virtue of the concurrent jurisdiction of Wisconsin over the Mississippi river, its laws defining and punishing murder extended over those waters, and justified prosecution and punishment for a crime there committed, but outside of Wisconsin territory. Again, in *Keator L. Co. v. St. Croix Boom Corp.* 72 Wis. 62, 38 N. W. 529, it is decided that "concurrent jurisdiction" does not mean "joint jurisdiction," in the sense that only legislative acts adopted by both states can have effect over the boundary waters. General discussion of the subject will be found in Rorer, Inter-St. Law, ch. 34.

As I have already said, no case has been found or cited negativing the principle announced by these cases and already adopted by our own state. Their authority is at least not expressly questioned in the opinion filed on behalf of the court in this case, nor is there suggested any reason why, upon that principle, the concurrent jurisdiction "does not include the right to regulate the enjoyment, by the people of one state, within its domain, of rights incident to their situation, such as the right to navigate or fish." As I have already said, I am wholly unable to see why the conduct of a man in fishing upon a river is not as legitimately the subject of police regulation as the conduct of the man in selling liquor, piloting a boat, or maintaining a disorderly house. At many places in the United States, harbors are situated so as to be within the concurrent jurisdiction of different states. These harbors must be policed, and, subject to the paramount authority of the United States when that authority is exercised, the safety of the use of that harbor must be preserved. The speed of boats, the giving of signals, the carrying of lights, the location for purposes of anchorage—all are subjects customarily regulated, in some degree at least, by the local authorities, and are, it seems to me, directly within the scope which has been accorded to this concurrent jurisdiction. It is said in the opinion of the court, speaking of the Great Lakes between Canada and the United States, as in analogy to the case of states with concurrent jurisdiction, that "no one would venture to say that one country could enforce its laws for the preservation of fish, or regulating the taking of fish, within the territorial limits of the other." If this means upon the coterminous water boundaries, and it were conceded that concurrent jurisdiction existed in the same sense that it does by express provision between adjoining states, I think this assertion is rather too broad. I, for one, do venture the opinion that in such case each country could assert the right to regulate and punish certain methods of taking fish, dan-

gerous to or destructive of the industry. Strangely enough, no case is cited in which such right has so much as been questioned, while, in the argument of so distinguished a lawyer and jurist as Mr. Phelps before an international tribunal, it was gravely contended, and of course sincerely, that, even upon the high seas, reasonable and proper regulation of the taking of fish by one country would, on the doctrine of comity, be deferred to by others, and permitted to be enforced against their citizens. 1 Moore's Hist. & Dig. of International Arbitrations, p. 843. Further, it is discoverable that, in the compact between New York and New Jersey defining the middle of the harbor as the territorial limit, and granting to New York jurisdiction over the entire waters, New Jersey expressly excepted and reserved the right to regulate fisheries in her part of the harbor, clearly evincing the understanding of the parties that otherwise jurisdiction included authority for such regulation, and exclusive jurisdiction in New York would exclude New Jersey therefrom. Article III, sec. 3, Compact N. Y. & N. J., printed 48 Barb. 505.

I do not discuss what is made the basis for a considerable portion of the court's opinion, namely, the question whether under any circumstances one state can prevent the obstruction and impairment of the usefulness of the river by permanent structures so affixed to the ground that they become, not river, but part of the solid territory of the opposing state, on which see *People v. Cent. R. of N. J.* 48 Barb. 478. I forego this discussion for the reason that the question is not here presented. It is ruled in the opinion, with my entire concurrence, that the placing of the net in the waters of this lake gave it none of the characteristics of such fixture; that it no more became a part of the land of Wisconsin than would a boat because anchored to the bottom, which was the case presented in *Welsh v. State,* 126 Ind. 71, 25 N. E. 883.

A suggestion was made in argument that, by recognizing the law of Minnesota as a justification to her officer, we

should in effect be enforcing her criminal laws, which, confessedly, no other sovereignty can do. *Wisconsin v. Pelican Ins. Co.* 127 U. S. 265, 8 Sup. Ct. 1370. Such argument embodies a fallacy. It would not be enforcing the criminal laws of Minnesota to merely recognize that they constitute a defense to her officers when acting under them within her jurisdiction. The argument, if sound, would make every sheriff liable in trespass for every arrest whenever personal jurisdiction over him could be acquired in any other state, for he must admit the trespass, and could not invoke the law of his official residence and action as a defense.

To summarize my view: This state, having decided that its concurrent jurisdiction enables it to define and punish a crime upon boundary waters but in the territorial limits of Minnesota, cannot deny to that state the same right upon those waters.