L. W. LITTLE, Appellee, v. A. M. GREEN and FRANK CARSON, Appellants.

**Fish and game:** SEINING WATERS OF THE STATE: NUISANCE: DAMAGES. The statutes of this State prohibiting the seining of fish from any of its waters, while not applicable to the Mississippi, Missouri and a portion of the Des Moines Rivers, do apply to a nonnavigable slough, lying wholly within the boundary of this State, though connected with and supplied in part with water from the Mississippi River; and a seine kept and maintained for the purpose of taking fish therefrom is a nuisance and may be seized by the proper authorities without warrant and destroyed, without liability in damages therefor.

*Appeal from Jackson District Court.*—HON. J. W. BOLLINGER, Judge.

THURSDAY, NOVEMBER 18, 1909.

THE case is sufficiently stated in the opinion.—*Reversed*.

*Thomas & Thomas,* for appellants.

*T. W. Darling,* for appellee.

WEAVER, J.—At the time of the occurrences in con-
troversy the defendants were deputy game and fish ward-
ens duly appointed under the laws of the state.   Acting,
as they claim, under the authority conferred upon them
by the statute, chapter 15, title 12, of the Code and
amendments thereto, they seized and destroyed a fish net
or seine owned by the plaintiff on the ground that the same
was being used or kept for use in taking fish unlawfully
from the waters of this state.   It is not disputed that the
net in question was being used, or had recently been used,
in seining fish from the waters of what is known in the
record as "Running slough" in the east part of Jackson
County, but it is asserted that "Running slough" is, in
fact, a part of the Mississippi River, and therefore the
fishing was not unlawful.   This contention suggests the
point on which the case turns, and necessitates an ex-
amination of the statute in question.   Code Supplement
1902, section 2539, declares any seine, net, trap, or con-
trivance in use, kept or maintained for the purpose of
catching fish contrary to law is a public nuisance, and
makes it the duty of wardens, sheriffs and constables to
seize and destroy the same without warrant, and relieves
them from liability to any person for damages on such ac-
count.   Section 2540 of the same statute makes it unlaw-
ful for any one at any season of the year to take any fish,
except minnows for bait, from any of the waters of the
state by any other means or device than hook and line.
Section 2547 is as follows: "Nothing herein shall be held
to apply to fishing in the Mississippi or Missouri Rivers
nor to so much of the Des Moines River as forms the
boundary line between this state and Missouri."   To make
clear the geography of the situation, we here insert a plat
showing the location of Running slough and other natural
features in that vicinity.

Running slough is that stream or body of water open-
ing from the river at "A," and extending through the
point "E" to "B," where it again connects with the river.
The body of water extending west from "E" to "D" is
known as Brown's Lake.　The slough is about one hun-
dred feet wide, and is not navigable, but affords passage
for rowboats and launches, except in times of low water,
and there is some current or movement in the water from
north to south.　A stream called "Smith's creek," orig-
inating some four or five miles south and west of the
point "A," flows northeast, joining the slough just below
its point of departure from the river.　The land included
between the river and slough, and locally known as "Rail-
road Island," is somewhat lower than the land to the west
of the slough, and is quite heavily timbered.　The map in-

dicates that the lines of the government survey of the land
into sections extend from the territory on the south and
west across the slough, and terminate upon the meander
of the river bank.    This action originated in justice's
court, and was carried by appeal to the district court,
where a jury was waived and trial had to the court.   The
court, being of the opinion that Running slough is to be
considered part of the Mississippi River, and that plaintiff
was therefore within his legal rights in taking fish there-
from with a net, entered judgment in his favor for the
sum of $15 and costs, but, in view of the importance of
the issue involved, certified the case as a proper one for
hearing upon appeal in this court.   Defendants appeal.

A proper understanding of the law of the case will
be facilitated by noting the circumstances leading to the
exception of the Mississippi, Missouri, and (in part) Des
Moines Rivers from the operation of our statute regulat-
ing the extent to which, and the manner in which, fish
may be lawfully taken from the waters of the state.   The
original act of Congress providing for the organization and
admission of Iowa as a state, approved March 3, 1845
(Act March 3, 1845, chapter 48, 5 Statute 742), pro-
vides that:

The state of Iowa  shall have concurrent jurisdiction
on the River Mississippi and every other river bordering
on the said state of Iowa, so far as the said rivers form a
common boundary to such state and any other state now
or hereafter to be formed or bounded by the same; said
rivers to be common to both; and the said River Missis-
sippi and the navigable waters leading into the same shall
be common highways and forever free as well to the in-
habitants of said state as to all other citizens of the United
States without any tax, duty, import or toll therefor im-
posed by the said state of Iowa.

Similar provision is made in the act admitting Illi-
nois as one of the United States, assuring its concurrent

jurisdiction over the Mississippi River so far as it forms a part of the common boundary. The existence of this common jurisdiction is also recognized in the opening chapter of our Code (sections 1, 2, 3). The reasons for such provision have been considered by this court in *Gilbert v. Water Power Co.,* 19 Iowa, 319. In that case the defendant erected a dam across the south or slough channel of the Mississippi River between certain named islands and the Illinois shore, all said obstructions being on the Illinois side of the main channel, but constituting, it was alleged, a nuisance by which the water was caused to overflow plaintiff's land on the Iowa side of the stream, and this alleged nuisance the plaintiff asked to have abated. In holding that the Iowa courts are without jurisdiction to entertain such action, the opinion, prepared by Wright, J., says:

Appellant bases the claim of jurisdiction upon the language of the acts admitting Illinois and Iowa into the Union and the provisions of the Constitution and statutes of each in defining their respective boundaries. The act of 1818 (Act April 18, 1818, chapter 67, 3 Statute 428), admitting Illinois, gives to said state concurrent jurisdiction on the Mississippi River with any state or states to be formed west thereof so far as they shall form a common boundary. The act admitting Iowa contains the same provision as to concurrence of jurisdiction. The statutes of Illinois recognize the same extent of jurisdiction, and in this state it is declared that our jurisdiction is concurrent on the waters of any river or lake which forms a common boundary between this and any other state. By our Constitution our eastern boundary is the middle of the main channel of the Mississippi River. Now, while it is, of course, not claimed that the laws of this state would have any inherent authority beyond the jurisdiction of this state, or that our laws can bind or affect property out of or beyond our territorial limits, it is insisted that this property or this alleged nuisance is so situated that either state may direct the manner of its use and order its removal or abatement. That the courts of Illinois might do

it there is, of course, no doubt. But the claim is that our
courts have the same concurrent right on the complaint of
one of our citizens whose property situated within our
jurisdiction is injured by the alleged unlawful obstruction.
We do not believe, however, that the acts and constitutional
provisions referred to include cases like the one before us.
There is an immense commerce on this great common
highway. Water craft, rafts and boats of almost every
kind and description are each day floating upon its waters.
Thousands of persons are engaged in this commerce. Con-
tracts are made and obligations assumed for which these
boats and crafts may under certain proceedings be made
liable. Injuries are inflicted upon persons and property
by persons while on the river for which they should be
held answerable civilly as well as criminally. If juris-
diction was made to depend in all such cases on the inquiry
whether the boat or vessel was on one side or the other
of the main channel, or whether the injury was inflicted
or crime committed east or west or north or south of such
line, it can readily be seen that it would be frequently
almost impossible to determine such jurisdiction, and that
a mistake in this respect would prove fatal to the action
or prosecution. And hence the reason of making the juris-
diction concurrent in all such cases. Such persons are as
a rule transitory, moving; here today and gone tomorrow.
Here is a common highway open to the citizens of all
states and all nations. It is declared common territory,
and, as to all matters arising thereon or persons found
thereon, the sovereignties on either side have common and
concurrent jurisdiction.

We have indulged in this liberal quotation from the
precedent cited, not because of any marked parallelism
between the facts there considered and those presented by
the instant case, but because, as we conceive, it suggests
the proper limitations to be placed upon the concurrent
jurisdiction of the states, and affords a standard of ma-
terial value in construing and applying the provisions of
the law by which the taking of fish from the Mississippi
River is excepted from the prohibitions and regulations
which control fishing in other waters of the state. In this

connection it is also well that we bear in mind the rule of frequent application that words are often controlled, restricted, or modified in their significance "by the subject under discussion when they are used." *Bridge Co. v. Dubuque,* 55 Iowa, 564.

It is very evident from the situation as here presented that the Legislature in enacting this statute recognized the fact that the two states in the exercise of their respective sovereignties might adopt materially different policies with respect to their game and fish laws, and that any attempt to enforce the peculiar regulations of one state upon a river which is subject to the concurrent jurisdiction of both would lead to serious complications, and difficulties, and, to avoid this, the exception was ingrafted upon the statute. That such exception must be strictly limited to the area of common jurisdiction is plain, for otherwise it would probably render the statute unconstitutional under the provision requiring that all legislation of a general nature shall have uniform application. What is meant when we speak of the river as a "common boundary" of the two states? Do we mean the body of the great stream which constitutes the common highway of commerce of which Justice Wright speaks in the *Gilbert* case, the navigable stream where the citizens of the two states and of other states meet and come in contact, and cross and recross each other's paths in the pursuit of their several lines of business and pleasure? Or do we mean not only this well-defined and unmistakable stream, but include therewith also all the interlacing unnavigable water belts, streams and streamlets which, in the level alluvial bottom lands through which the river flows, emerge here and there from such main body, make their way inland for greater or less distances, and then perhaps reunite with the navigable waters of the river further down its course? In our judgment these minor waters, which constitute no part of the navigable stream, and do not in any manner or form

give rise to the circumstances which the court has held
constitute the reason for the common authority of the two
states, are not subjects of the common jurisdiction.

This common authority by the very terms of the act
of Congress goes only "so far as said river shall form a
common boundary." Can it be said upon any fair con-
struction of this language (and especially if we give any
heed to the discussion by the court in the *Gilbert* case)
that this small thread of water supplied in part by an
opening or outlet from the river and in part by the waters
of Smith's creek and such surface waters and drainage as
it may receive in its course, and making its entire course
of several miles through lands which are admittedly wholly
within the territorial jurisdiction of Jackson County,
constitute any part of the "common boundary" between the
states of Iowa and Illinois? We have no hesitation in
answering this question in the negative. To hold otherwise
would lead to a most anomalous condition of affairs. Sup-
pose the other view should obtain, and that two citizens of
Jackson County afloat in a rowboat on Running slough,
or while bathing in its waters, should engage in a quarrel
and one of them assault the other; would it be competent
for the injured person to take passage to the Illinois side
of the river, and there maintain a criminal prosecution
against his assailant? Or suppose these defendants were
Illinois fish wardens; and having discovered the plain-
tiff using his seine on the east side of the river in a
slough of the same kind and character as Running slough,
and wholly within the territorial jurisdiction of that state,
they wrongfully beat and abuse him, would the courts of
Jackson County, Iowa, assume jurisdiction to try them
for such offense? Clearly not. To so hold is to encounter
a sea of troubles never contemplated by the framers of the
law upon this subject. A glance at the accompanying map
reveals that from ten to fifteen sections of land along the
east border of Jackson County are intersected and carved

in various shapes by small streamlike sloughs which are no part of the navigable Mississippi, though connected therewith. As a matter of common knowledge the same conditions exist in many other counties bordering on this river and in still other counties bordering on the Missouri, and, if all these waters are to be held the subject of common jurisdiction, we shall be placed in the awkward if not intolerable situation of acknowledging the authority of Illinois and Nebraska to assume criminal jurisdiction over our own citizens for alleged offenses committed wholly within our borders, and not upon the common highways which separate the one state from the other. We can see nothing in the statutes or precedents or principles involved to prevent our holding that, while the actual boundary line between the states is the middle thread of the main channel, the entire body of the navigable stream is to be treated as the visible, tangible, practical boundary over which both states may exercise authority so far at least as is necessary to protect and enforce the rights of all persons thereon. It is true that in *State v. Haug*, 95 Iowa, 413, a case arising under this same statute, and having some features similar to the one at bar, the fact that Big Lake, the body of water there in question, showed no current, was given some weight as evidence that it formed no part of the river, but there is no holding there or in any other case called to our attention that proof of a current in the stream is in itself sufficient to establish its character as a part of the river. On the contrary, the opinion goes far to uphold the rule which we here apply. In summing up the facts of the case, the court says:

From the evidence it is clear that Big Lake is not a part of the Mississippi River so far as navigation is concerned. It is not disputed that it lies wholly within the state of Iowa. It follows, then, that Big Lake, lying as it does wholly within the state of Iowa, does not constitute a part of the Mississippi for boundary purposes. We think

it quite clear that the intention of the law was to prohibit seining within waters wholly within the state. . . . We think the Mississippi River, which is excluded from the provisions of this act, includes only that body or stream of water which is popularly known as such river; that the wording of section 11 of the act indicates that it was the Mississippi River which constitutes the boundary line of the state which the legislature had in mind.

It is well in this connection to recall and emphasize the importance of the discussion by Mr. Justice Kinne in the cited case upon the evils which the statute regulating the taking of fish was intended to remedy. He says:

The purpose was to prevent the wanton and unnecessary destruction of fish in the waters over which the state has exclusive jurisdiction and to preserve the fish in said waters for the use of the people of the state. If it be true that these lakes and streams which, though connected with the main body of water known as the Mississippi River, yet form no part of the river proper, are not waters in which seining is prohibited, then the legislation falls short of remedying the evil which existed, and these waters of the state which constitute the most valuable fishing grounds in the state may be despoiled in this wholesale way of their wealth of fish without let or hindrance. To be justified in reaching such a conclusion, it should appear clearly that such waters were intended to be exempt from the operation of the law. We find nothing in the law to warrant defendant's contention. . . . The Mississippi River spoken of in the statute is the river as usually referred to. It means the body of water which forms the eastern boundary of the state, and from the wording of the act it is manifest it was not intended to embrace within the words 'Mississippi River' waters entirely within the state, though having connection with the boundary stream.

It follows, therefore, both upon precedent and upon the express language and clear implications of the law,

that Running slough is not within the exception of the statute which forbids the seining of fish from the waters of the state, and that the act of the appellants in destroying the appellee's seine constituted no actionable wrong. Appellee's action for the recovery of damages should have been dismissed, and the cause will be remanded for that purpose.—*Reversed.*